MARYLAND CASUALTY COMPANY *vs.* COMMISSIONER OF INSURANCE
(and a companion case between the same parties).

Suffolk.    January 7, 1977. — May 11, 1977.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Insurance,* Insurance company, Commissioner of Insurance.    *State Administrative Procedure Act.    Practice, Civil,* Proceeding for review of order by Commissioner of Insurance.    *Statute,* Construction. *Words,* "Insolvency."

Where an insurance company sent notices of its intent not to issue or renew Massachusetts automobile insurance policies prior to the effective date of G. L. c. 175, § 22H, as amended through St. 1975, c. 750, § 1, but the effective date of such nonrenewal was subsequent to the effective date of the statute, the insurance company was subject to the provisions of § 22H. [558-561]

The Commissioner of Insurance correctly interpreted G. L. c. 175, § 22H, as requiring an insurance company which refused to issue automobile insurance policies in Massachusetts to show objective proof of a threat to its solvency. [562-563]

Where, in a proceeding under G. L. c. 175, § 22H, a deputy commissioner of insurance failed to make sufficient findings with respect to the protection of an insurance company's solvency to enable this court to determine whether his decision was supported by substantial evidence, the case was remanded for completion of findings of fact. [563-569]

In a proceeding under G. L. c. 175, § 22H, there was substantial evidence to support a determination by a deputy commissioner of insurance that an insurance company's refusal to issue automobile insurance policies disrupted the market in Massachusetts. [569-570]

The sanctions provided by G. L. c. 175, § 5, are not applicable to violations of § 22H. [570-571]

Where an order of the Commissioner of Insurance suspending an insurance company's license was unclear with respect to whether it was imposed under G. L. c. 175, § 5, as a result of violations of §§ 22E and 113E or under § 22H for failure to comply with the requirements of that section, the case was remanded for clarification. [571]

There was no merit in an insurance company's arguments that a suspension order by the Commissioner of Insurance was unconstitutional or that G. L. c. 175, § 22H, constituted an unconstitutional delegation of legislative power. [571]

In a proceeding under G. L. c. 175, § 22H, against an insurance company for its refusal to issue or renew automobile insurance policies,

a deputy commissioner of insurance did not err in excluding evidence which showed that certain companies licensed to write automobile insurance in the previous year had not done so and that certain companies had been granted license amendments deleting authority to write automobile insurance where the proffered evidence did not in fact illuminate past administrative practices and referred to a time prior to the amendment of § 22H by St. 1975, c. 750, § 1. [572]

There was nothing in G. L. c. 26, § 7, which required the Commissioner of Insurance to grant an insurance company a hearing on its administrative appeal from a decision of a deputy commissioner. [572]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on September 23, 1976.

The case was reserved and reported by *Quirico*, J.

CIVIL ACTION commenced in the Superior Court on September 23, 1976.

The case was reported by *Dimond*, J., to the Appeals Court, and the Supreme Judicial Court granted a request for direct review.

*Gael Mahony* (*Boisfeuillet Jones, Jr., & Stephen J. Kiely* with him) for Maryland Casualty Company.

*Terence P. O'Malley*, Assistant Attorney General, for the Commissioner of Insurance.

HENNESSEY, C.J.    Maryland Casualty Company (Maryland Casualty) appeals from an order of the Commissioner of Insurance (Commissioner) which suspended the license of Maryland Casualty to sell all types of insurance in the Commonwealth. Two cases were consolidated for appeal, one brought originally in the Superior Court pursuant to G. L. c. 30A, and one brought originally in the Supreme Judicial Court for the county of Suffolk pursuant to G. L. c. 175, § 5; both were reported without decision.

We conclude that the decision and order in each case must be vacated and both cases must be remanded to the Commissioner for further findings of fact. See G. L. c. 30A, § 11 (8).

Maryland Casualty, a property and casualty insurance company having its principal offices in Maryland, has been licensed to write insurance in the Commonwealth since

1908. In the years prior to 1976, Maryland Casualty wrote a variety of types of insurance in the Commonwealth, including automobile insurance. The total volume of Massachusetts insurance written by Maryland Casualty in 1975 was $15,955,000, of which $9,611,000 (approximately 60%) represented nonautomobile insurance[1] and $6,344,-000 (approximately 40%) represented automobile insurance.

Beginning in late September, 1975, Maryland Casualty took action to withdraw from the Massachusetts automobile insurance market effective January 1, 1976. That action consisted of the following steps: (1) letter and notice dated September 26, 1975, sent to Maryland Casualty's Massachusetts agents informing them of its intent to withdraw from the sale of Massachusetts automobile insurance in 1976 and modifying their agency contracts for 1976 to eliminate authority to write Massachusetts automobile insurance; (2) notice dated November 15, 1975, sent to all Massachusetts agents and policyholders informing them of its intent not to issue or renew Massachusetts automobile insurance policies; (3) letter dated December 1, 1975, sent to the Commissioner requesting amendment of its license to delete automobile insurance; and (4) notice sent on December 3, 1975, to all Massachusetts policyholders informing them that their policies were cancelled effective 12:01 A.M. on January 1, 1976, which was the expiration date of all policies in effect in 1975.

The nonrenewal notices gave the following explanation of Maryland Casualty's action: "The Company for business and economic purposes must withdraw entirely from Massachusetts Auto Insurance market. The termination of your policy is a result of general reduction in volume of auto insurance and does not reflect on your personal insurability." Attached to these notices was a letter from

---

[1] The nonautomobile insurance included fire, homeowners', workmen's compensation, boiler and machinery, general liability and surety bonds.

Maryland Casualty to its Massachusetts policyholders further explaining its decision to withdraw from the Massachusetts automobile insurance market. It stated that "the regulatory burdens have reached the point where it is not sound business for us to continue" and contained a list of eleven respects in which it contended that the Massachusetts insurance regulation scheme was unduly burdensome.

Notices were sent to Maryland Casualty by a deputy commissioner of insurance, the first of which was dated December 10, 1975, informing the company that a public hearing would be held to determine whether its license to sell all types of insurance in the Commonwealth should be suspended or revoked because its refusal to issue or renew Massachusetts automobile insurance policies constituted violations of G. L. c. 175, §§ 22E, 22H, 113E, and such violations constituted "violations of law" for the purposes of G. L. c. 175, § 5. A hearing was held on March 3, 4, and 5, 1976, at which Maryland Casualty was afforded an opportunity to show cause why all of its licenses should not be suspended or revoked.

A deputy commissioner issued his findings and order on August 24, 1976, in which he made the following conclusions of law: (1) Maryland Casualty violated G. L. c. 175, § 22H, by refusing to write automobile insurance business,[2] thereby disrupting the market for such insurance in the Commonwealth, without such refusals being justifiably required to protect the solvency of the company; (2) Maryland Casualty violated G. L. c. 175, § 22E, by refusing to renew insurance policies at the option of the policyholder for reasons other than those specified as permissible under that section; (3) Maryland Casualty violated G. L. c. 175, § 113E, by refusing to issue automobile insurance policies for reasons other than those provided by that section; and (4) Maryland Casualty was

---

[2] Automobile insurance for the purposes of this opinion and the relevant statutes are those property protection and motor vehicle liability policies defined in G. L. c. 90, §§ 34A, 34O.

subject to the penalties established by G. L. c. 175, § 5, for violations of G. L. c. 175, §§ 22E, 22H, and 113E. He therefore imposed a thirty-day suspension of Maryland Casualty's licenses to issue or sell any form of insurance in the Commonwealth and a subsequent indefinite suspension to continue until Maryland Casualty demonstrated its willingness to resume the issuance and renewal of Massachusetts automobile insurance policies in compliance with the State insurance statutes and the rules and regulations of the Commissioner. The Commissioner affirmed the findings and order, modifying only the effective date of the order and of the two suspensions. A single justice of this court stayed the suspension order pending decision by the full court.

1. General Laws c. 175, § 22H, as amended through St. 1975, c. 750, § 1, effective December 15, 1975[3] (hereinafter called December amendment), provides in part: "If any company refuses to issue motor vehicle liability policies or bonds ... without a written determination by the commissioner that such refusal, which may be a refusal in whole or in part, is justifiably required to protect the solvency of the refusing company, the commissioner shall hold a public hearing at which the company may appeal the commissioner's initial determination concerning solvency and at which shall be considered whether the company's refusal to write motor vehicle liability policies or bonds is contrary to the public interest by disrupting the market for said insurance in the commonwealth. If the commissioner finds, on the basis of said public hearing, that the company's refusal is not justified by the protection of solvency and is contrary to the public interest, he shall suspend such company's licenses to issue or sell any other form of insurance within the commonwealth until such company resumes the issuance or renewal of motor

---

[3] This statute carried an emergency preamble which stated: "The deferred operation of this act would tend to defeat its purpose which is to provide *immediate* relief to owners of motor vehicles therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience" (emphasis added).

vehicle liability policies or bonds in compliance with the laws and rules and regulations prescribed by the commissioner."

Maryland Casualty contends that this amended version of § 22H was not applicable to these proceedings because all the steps taken by the company to withdraw from the automobile insurance market were completed prior to the effective date of the amendment. The Commissioner concluded that the December amendment was applicable, on the basis that the nonrenewals were not effective until January 1, 1976. Review of the deputy commissioner's findings and order is under G. L. c. 30A, § 14, and questions of law involved in his determination are subject to de novo judicial review. See, e.g., *Raytheon Co.* v. *Director of the Div. of Employment Security,* 364 Mass. 593 (1974).

We agree with the Commissioner's determination as to the applicability of the December amendment to the proceedings in this case. While the nonrenewal notices mailed on December 3, 1975, to Maryland Casualty policyholders are, under the terms of § 22H, sufficient evidence to show a refusal to issue,[4] the evidentiary standard thus provided does not purport to define the entirety of the violation which will give rise to proceedings under this section. A violation of § 22H occurs when the notices of nonrenewal or cancellation are sent to policyholders, and a single such notice is a sufficient basis on which the Commissioner may hold a public hearing as provided by this section.

The statute provides merely the minimum basis for action by the Commissioner, indicating the Legislature's intent that the Commissioner be empowered to take action prior to the actual effective date of nonrenewal or cancellation in the interest of protecting the stability of the market and the interests of Massachusetts insurance consumers. Section 22H in no way confines violation of its

---

[4] Section 22H provides in relevant part: "For purposes of this section, a refusal to issue motor vehicle liability policies or bonds shall be sufficiently evidenced by a single notice of cancellation or non-renewal for grounds other than those specifically permitted in the general laws."

provisions to the happening of one particular event at one discrete point in time; refusal to issue without the required written determination by the Commissioner that such refusal is justifiably required to protect the solvency of the company is a continuing violation which begins when the cancellation or nonrenewal notices are sent to policyholders and which extends to the actual effective date of the cancellation or nonrenewal.

In the case now before us, Maryland Casualty sent its nonrenewal notices on December 3, 1975, the effective date of such nonrenewal being January 1, 1976. When the policies in question were not renewed as of that date, without the above described written determination by the Commissioner, the actions of Maryland Casualty came within the purview of § 22H. As of January 1, 1976, Maryland Casualty was subject to the provisions of § 22H, by reason of its failure to request the required determination by the Commissioner in the interval between December 15, 1975, the effective date of § 22H, as amended, and January 1, 1976.[5] We find no constitutional prohibitions to such a conclusion.

In addition, while the December amendment was not effective until after the nonrenewal notices were issued, § 22H had been previously amended by St. 1975, c. 707, § 8, effective on passage November 26, 1975 (November amendment),[6] prior to the issuance of nonrenewal notices.[7]

---

[5] The deputy commissioner concluded that Maryland Casualty could have revoked its notices of cancellation as of December 15, 1975, and thus brought itself into conformity with the law. Maryland Casualty does not deny that it could have done so but argues that by that date many, if not most, existing policyholders would have obtained alternative coverage, leaving only the "worst" of its policyholders without coverage. Such an argument has no merit if Maryland Casualty was legally obligated to renew existing policies, and its "worst" policyholders did not fall within the permissible grounds for nonrenewal provided by G. L. c. 175, § 22E.

[6] The November amendment provided: "If any company refuses to issue motor vehicle liability policies or bonds . . . the commissioner shall hold a public hearing to determine whether the companies [*sic*] removal from the automobile insurance market is required because of insolvency and whether such removal would be contrary to the public

While the language of the November amendment was sufficiently unclear as to have necessitated prompt amendment, it did graft considerations of the company's solvency and disruption of the market on to the original version of § 22H.[8] While the November amendment does not provide for advance written determination by the Commissioner, we think that it contains adequate notice that a company which refuses to issue motor vehicle liability policies may be subject to suspension unless the refusal is based on considerations of company solvency.[9]

We now turn to a consideration of the two issues presented in reviewing the deputy commissioner's factual determinations under § 22H:[10] (1) whether his conclusion that the refusal to issue by Maryland Casualty was not justifiably required to protect the solvency of the company was supported by substantial evidence, and (2) whether

interest by disrupting the insurance market in the commonwealth. If the commissioner determines that the evidence warrants removal from said market, he shall suspend such company's licenses to issue or sell any other form of insurance within the commonwealth until such company resumes the issuance or renewal of such motor vehicle liability policies or bonds in compliance with the laws and rules and regulations prescribed by the commissioner."

[7] The sequence of events here is peculiar to the case now before us. While a number of insurance companies announced their intention to withdraw from the Massachusetts automobile insurance market at the end of 1975 and took steps to do so, most of these companies did not actually withdraw. Of the few companies which did withdraw from the market, all except Maryland Casualty surrendered their licenses to transact other insurance business in the Commonwealth.

[8] Section 22H, inserted by St. 1970, c. 744, § 1, provided in part: "If any company refuses to issue motor vehicle liability policies ... the commissioner may after a public hearing suspend said company's license to issue or sell any other form of insurance within the commonwealth until said company resumes the issuance or renewal of such motor vehicle liability policies in compliance with the laws and rules and regulations prescribed by said commissioner."

[9] The December amendment in fact provides a less restrictive standard than does the November amendment. While the November amendment refers to "insolvency," the December amendment permits refusal to issue if such refusal is "justifiably required to protect the solvency of the refusing company."

[10] Whether Maryland Casualty's actions constituted a refusal to issue within the meaning of § 22H is not an issue in these cases.

his conclusion that the refusal to issue by Maryland Casualty disrupted the motor vehicle liability insurance market in the Commonwealth was supported by substantial evidence. See G. L. c. 30A, § 14 (7) (*e*).

2. The deputy commissioner defined the threat to solvency standard of § 22H as follows: "Solvency may be considered as the reasonable expectation that a company will be able to continue to meet its financial obligations. A threat to the solvency of a company must then be an act, event or occurrence which would or could alter the· expectation that a company will be able to meet its financial obligations." Maryland Casualty argues that this standard was in error and suggests that the correct test should be whether a company has made a good faith business decision, based on competent information that action is necessary to prevent insolvency from becoming a present danger. The essential issue is whether the Legislature intended a subjective or an objective standard to be applied by the Commissioner.

We conclude that the Commissioner was correct in his formulation of an objective standard. The purpose of § 22H would be greatly undermined if permissible withdrawal from the Massachusetts automobile insurance market were to be governed by "good faith" business decisions. Such a construction would render the stability of the market and the availability of automobile insurance to Massachusetts consumers subject to the discretion of insurers, a result clearly contrary to the legislative intent to remove such discretion from insurers, even if founded in a good faith decision regarding the company's financial picture. The Commissioner has long been charged by statute with the responsibility to oversee the financial stability of insurance companies and to take steps up to and including revocation of licenses if warranted (see, e.g., G. L. c. 175, §§ 4, 5, 6), and the evaluation of a company's financial status is peculiarly within his technical competence and expertise. The Commissioner has no interest in forcing a company which is or soon may be in a demonstrably precarious position to continue writing insurance in Mas-

sachusetts. Such a result would be directly contrary to his responsibility to protect the public interest by ensuring the financial integrity of insurance companies doing business in this State.

We conclude further that the standard adopted by the Commissioner is consistent with the statutory language. The meaning of "insolvency" is well established: "At common law insolvency means inability to pay debts in the usual course of trade." *Calnan* v. *Guaranty Security Corp.,* 271 Mass. 533, 542 (1930). It follows, as the deputy commissioner concluded, that protection of solvency refers to action necessary to preserve a reasonable expectation that the company will be able to continue to meet its financial obligations. An insurance company wishing to avail itself of the protection of solvency justification must demonstrate that a situation exists which has altered or which without corrective action could alter the company's ability to meet its financial obligations as they come due. Whether such a situation exists is a question for the objective determination of the Commissioner.

The interpretation adopted by the Commissioner is not binding on us, but it is entitled to our consideration. See, e.g., *Board of Educ.* v. *Assessor of Worcester,* 368 Mass. 511, 515 (1975); *Devlin* v. *Commissioner of Correction,* 364 Mass. 435, 439 (1973); *Cleary* v. *Cardullo's, Inc.,* 347 Mass. 337, 343-344 (1964). We conclude that, in light of the language chosen by the Legislature and the legislative purpose, the interpretation applied by the Commissioner was correct.

3. Maryland Casualty introduced extensive evidence in support of its contention that its withdrawal from the Massachusetts automobile insurance market was justifiably required to protect its solvency. The evidence was voluminous, and we will summarize it in necessarily abbreviated form.

Maryland Casualty is a stock company which is wholly owned by American General Insurance Company (American General), a Texas corporation which in addition to being a holding company writes a small amount of prop-

erty insurance and surety bonds which is reinsured 100%
with Maryland Casualty. Maryland Casualty has wholly
owned insurance subsidiaries which also reinsure their
business 100% into Maryland Casualty. The business
which Maryland Casualty receives, both directly and by
cession from its subsidiaries and from American General,
is reinsured to the extent of 25% with American General.

At the end of 1972, Maryland Casualty's policyholders'
surplus (surplus) stood at $185,511,000. The ratio of net
premiums written to surplus was less than 2:1. The com-
pany's reserve for losses and loss adjustment expense was
$186,808,000.

In 1973, Maryland Casualty had an underwriting profit,
but surplus had declined to $153,498,000 by the end of
1973, primarily due to decrease in the market value of its
stock portfolio. By the end of 1974, surplus had declined
to $97,474,000, due primarily to two factors: (1) a decline
of approximately $47,000,000 in the market value of its
stock portfolio, and (2) an underwriting loss[11] of $18,803,-
000.[12] The ratio of net premiums written to surplus was
3:1 in 1974, a level which the company contends is gen-
erally recognized in the insurance industry to be a danger
signal. The reserve for losses and loss adjustment expense
stood at $202,218,000 at the end of 1974.

In the first quarter of 1975, Maryland Casualty had an
underwriting loss of $11,776,722, giving a composite ratio
of 108.7.[13] The company had a net operating loss of

---

[11] The underwriting loss figures presented by Maryland Casualty are
computed according to the "statutory" method of accounting under
which underwriting expenses, including the costs of acquisition of poli-
cies, are charged in the year incurred rather than amortized over the
lives of the policies.

[12] The underwriting losses cited by Maryland Casualty, as well as
figures for net premiums written, include the 25% of its business ceded
to American General. For example, if that insurance were not included,
the underwriting loss figure for 1974 would be $14,102,575.

[13] The composite ratio represents the amount paid out by the in-
surance company in losses, loss adjustment expense, and underwriting
expense for each dollar of premium earned, e.g., here, $1.087.

$2,400,000 in that quarter.[14] At the end of the second quarter of 1975, the underwriting loss stood at $26,297,684, and the composite ratio had increased to 109.5. The underwriting loss had increased to $10,500,000. At the end of the third quarter, the underwriting loss had increased to $39,542,357; the composite ratio was 109.3; and the net operating loss was $17,600,000. Surplus, which had increased in the first two quarters due to the improved market value of the company's stock portfolio, dropped to $101,800,000 in the third quarter.

While the figures for the entire year of 1975 were not available until after Maryland Casualty had issued its nonrenewal notices, the underwriting loss for the year was $67,628,291, and the composite ratio for the year was 113.6. The net operating loss for the full year was $16,985,790. The total net premiums written in 1975 was $347,361,000 (excluding insurance ceded to American General). Surplus at the end of 1975 stood at $103,728,000, which included a $15,000,000 contribution to surplus by American General. The ratio of net premiums written to surplus was 3.4: 1 at the end of 1975, and the ratio of the loss reserves to surplus was 2.4: 1.

Maryland Casualty presented further evidence that its surplus position was impaired because an excessive amount of the surplus was overexposed to fluctuations in the stock market and that the market value of its investment bonds was $42,973,670 less than their book value.

With respect to Maryland Casualty's Massachusetts automobile insurance business, the company presented the following data as to underwriting profits or losses: In 1972, there was an underwriting profit of $228,584; in 1973, there was an underwriting loss of $436,361; in 1974, there was an underwriting loss of $126,978; in 1975, there was an underwriting loss of $697,099.

The company introduced evidence that in late 1975, it

---

[14] References to net operating loss are to the after tax figure calculated on the adjusted basis.

adopted changes in operations known as "Plan B" in an attempt to reverse its continuing losses. The changes were aimed at establishing stricter underwriting standards and at eliminating activities which were producing an underwriting loss and included withdrawal from certain lines of insurance and from certain territories which were unprofitable, the imposition of restrictions on the acceptance of new business, and the adoption of programs to increase premium rates where possible and to reduce agents' commissions and other expenses. The $15,000,000 contribution to surplus by American General was made as part of "Plan B." The decision to withdraw from Massachusetts automobile insurance was part of this plan.

The deputy commissioner made five subsidiary findings to support his conclusion that Maryland Casualty's refusal to issue automobile insurance policies was not justifiably required to protect the solvency of the company: (1) "There is a pooling of financial resources ... between Maryland Casualty and American General Insurance Company, its parent" (elipses in original); (2) "American General is willing to make a contribution to Maryland Casualty, if needed"; (3) "American General had net income in 1975 on a statutory basis of $15,946,000 ... and net income in excess of $50,000,000 on the basis of generally accepted accounting principles"; (4) "At December 31, 1975, Maryland Casualty had surplus to policyholders of $103,000,000"; (5) "Maryland Casualty's Massachusetts automobile business was *less* unprofitable than its country-wide automobile business for 1975."

We conclude that we are unable, on the basis of the deputy commissioner's subsidiary findings, to determine whether his conclusion is supported by substantial evidence. General Laws c. 30A, § 11 (8), inserted by St. 1954, c. 681, § 1, requires that "[e]very agency decision ... shall be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision." The requirement of subsidiary findings exists so that this court may exercise its appellate function to determine whether the findings of the agency

are supported by the evidence and whether given these findings, the agency correctly applied the law to the facts so found. *Save the Bay, Inc.* v. *Department of Pub. Utils.,* 366 Mass. 667, 687 (1975). See *Hamilton* v. *Department of Pub. Utils.,* 346 Mass. 130 (1963).

The deputy commissioner's findings in the cases now before us fall squarely within our rationale in *School Comm. of Chicopee* v. *Massachusetts Comm'n Against Discrimination,* 361 Mass. 352, 354-355 (1972): "[W]here the evidence is conflicting, the administrative agency is charged with the responsibility of making findings of fact and is in the best position to judge the credibility of witnesses. . . . However, that rule does not relieve an agency of its duty to make subsidiary findings of fact on all issues relevant and material to the ultimate issue to be decided. Nor does it relieve the agency of the duty to set forth the manner in which it reasoned from the subsidiary facts so found to the ultimate decision reached. . . . In the present case, no subsidiary findings were made on important portions of evidence which, in our view, are relevant and material to the ultimate decision reached by the Commission. On the record before us, we cannot determine whether the Commission disbelieved those portions of the evidence on which no subsidiary findings were made, or believed them but considered them not determinative of the ultimate issue. 'As it is, we have no way of knowing what facts . . . [were] found to exist and whether, in reaching its general conclusion . . . [the Commission] applied correct principles of law to the facts found by it.' *New York Cent. R.R.* v. *Department of Pub. Utils.,* 347 Mass. 586, 593 [1964]."

The deputy commissioner's findings with respect to the protection of solvency issue embrace only these factors: the ability and willingness of its parent company to make contributions to Maryland Casualty, the amount of Maryland Casualty's surplus at the end of 1975, and the fact that the company's Massachusetts automobile insurance was less unprofitable than was its nationwide automobile insurance business. The deputy commissioner made no

finding with respect to the evidence introduced by Maryland Casualty, discussed in the beginning of this part of the opinion. It may well be that on the basis of his expertise, his evaluation of Maryland Casualty's financial status differed markedly from the interpretation put forward by the company, as his findings suggest. However, he makes no findings with respect to (1) the manner in which he evaluated the financial data offered by Maryland Casualty, including, for example, significant variations in the figures which may result from the application of generally accepted accounting principles rather than the statutory accounting method and the practical effects of such variation; (2) the significance of these data with respect to the actual continued ability of the company to meet its financial obligations; (3) the significance of the relationship between Maryland Casualty and American General with respect to his evident conclusion that the assets of American General provide a buffer against serious financial difficulty for Maryland Casualty; and (4) the significance he attached to the company's surplus at the end of 1975 in light of Maryland Casualty's data with respect to net premiums to surplus, and loss reserve to surplus ratios and with respect to fluctuations in the market value of its stocks and bonds.[15]

This is not a case like *Katz* v. *Massachusetts Comm'n Against Discrimination,* 365 Mass. 357, 363 (1974), in which the findings made by the Commissioner directly contravene the evidence on which the company relied so as to establish that the Commissioner must necessarily have considered and rejected the evidence as not credible or determinative of the ultimate issue. Accordingly, the case must be remanded to the Commissioner for more complete findings of fact. See, e.g., *School Comm. of Chicopee* v. *Massachusetts Comm'n Against Discrimination,* 361 Mass.

---

[15] This list is not intended to be exhaustive but rather indicative of the general areas in which this court on review requires further and more complete findings by the Commissioner to enable us to determine whether there was substantial evidence to support his findings.

352, 355 (1972); *New York Cent. R.R.* v. *Department of Pub. Utils.*, 347 Mass. 586, 593 (1964).

4. We find no such problems with the deputy commissioner's findings with respect to the second determination required by § 22H, whether "the company's refusal to write motor vehicle liability policies or bonds is contrary to the public interest by disrupting the market for said insurance in the Commonwealth." We conclude that there was substantial evidence to support the deputy commissioner's conclusion that Maryland Casualty's withdrawal from the Massachusetts automobile insurance market did disrupt the market for such insurance in the Commonwealth.

The deputy commissioner found that "[t]hroughout the fall of 1975 many companies, including Maryland Casualty, announced their intent to abruptly cease the sale of automobile insurance in the Commonwealth effective January 1, 1976 .... By the end of 1975, the problem had reached crisis proportions with the real possibility that many of the drivers in the State might be unable to buy auto insurance in 1976 .... By December of 1975, agents of Maryland Casualty were canceled by the Company and were forced to apply to the Massachusetts Motor Vehicle Reinsurance Facility ('Facility') .... The facility, as a result, was required to amend its plan of operations to accommodate the canceled Maryland Casualty policyholders in the absence of a willing voluntary market.... In early December, 1975, approximately 20,000 policyholders of Maryland Casualty were advised that their insurance would be canceled on January 1, 1976 and they were forced to seek alternative insurance coverage for 1976 on very short notice ...."

Maryland Casualty cites the following evidence to support its contention that its withdrawal did not disrupt the market: (a) Only eleven of the company's 112 agents applied to the Facility for replacement coverage; (b) all Maryland Casualty policyholders obtained alternative coverage for 1976; (c) the Facility amended its plan of operations in response to the actions of other insurers as well as

Maryland; (d) only eleven of the seventy-five agents who applied for designated agent status under the amended plan of operations were agents of Maryland Casualty; (e) Maryland Casualty's share of the Massachusetts automobile insurance market was .8 of 1%; (f) 92% of Maryland Casualty policyholders obtained alternative coverage without making use of the Facility; (g) Maryland Casualty policyholders for whom replacement coverage was obtained through the Facility represented .06 of 1% of the Massachusetts automobile insurance market.

Maryland Casualty's argument is essentially that since the market mechanism was able to respond to its withdrawal, there was no disruption. However, the fact that the market, which includes all those involved in the insurance transaction (insurers, agents and brokers, and the insured, both present and prospective), responded to provide coverage for Maryland Casualty policyholders in no way negates disruption. For the purposes of § 22H the market is disrupted if the refusal to write causes disorder, confusion, or significant instability among the components which make up the market. The magnitude of the disorder necessary to rise to disruption of the market is for the Commissioner's determination based on his technical competence and expert knowledge of insurance market conditions, and in a case such as these in which approximately 20,000 policyholders were forced to obtain alternative coverage in less than a month's time, placing a heavy burden on other insurers, agents and brokers, the Facility and the policyholders themselves, we cannot say that the deputy commissioner's findings were not supported by substantial evidence. His findings clearly indicate that he considered the company's numerical data, but rejected these data as not determinative of the ultimate issue to be decided. See *Katz* v. *Massachusetts Comm'n Against Discrimination,* 365 Mass. 357, 363 (1974).

5. The Commissioner further concluded that the company violated G. L. c. 175, §§ 22E, 113E, which, along with the violation of § 22H, subjected the company to the sanctions provided by G. L. c. 175, § 5, as amended by St. 1933, c. 107, § 2, which provides that "[i]f the commissioner is

satisfied, upon examination or other evidence submitted to him ... that any foreign company has violated any provision of law ... he may revoke such licenses or suspend them for a period not exceeding the unexpired terms thereof." We conclude that the § 5 sanctions are not applicable to violations of § 22H. Section 22H provides a specific sanction to be imposed on companies which refuse to issue automobile policies if the required statutory determinations are made by the Commissioner. Such a sanction was imposed in these cases, and the justification of § 5 is unnecessary to support a suspension until the company resumes the issuance or renewal of automobile insurance policies.

However, the deputy commissioner also imposed an absolute thirty-day suspension to run for the thirty days prior to the effective date of the § 22H indefinite suspension. Since we have concluded that these cases must be remanded for more complete findings on the protection of solvency issue, we request that the Commissioner clarify this order with respect to the violations for which each sanction was imposed.[16]

6. Maryland Casualty also advances several constitutional arguments: (1) that the suspension order violates the company's right to due process of law in that (a) it is confiscatory, (b) it is a deprivation of liberty, (c) it is an unreasonable choice of legislative remedy, and (d) it amounts to the retroactive imposition of a punitive sanction; (2) that the suspension order violates the company's right to equal protection of the laws; and (3) that G. L. c. 175, § 22H, involves an unconstitutional delegation of legislative power. We have reviewed these arguments and find that they are without merit.

---

[16] The Commissioner's brief suggests that the thirty-day suspension was imposed under G. L. c. 175, § 5, for failure to comply with the requirements of § 22H. Since we have concluded that the sole sanction for violation of § 22H is that provided in that section, the thirty-day suspension cannot be supported on that basis. However, the deputy commissioner also concluded that the company violated G. L. c. 175, §§ 22E, 113E, and his order is unclear as to whether the thirty-day suspension was imposed for those violations or rather for failure to comply with § 22H.

7. Maryland Casualty further argues that the deputy commissioner erred in excluding evidence which showed (1) that certain companies which were licensed to write automobile insurance in 1975 did not in fact do so, and (2) that certain companies had requested and been granted license amendments to delete authority to write automobile insurance. We conclude that the deputy commissioner did not err in excluding this evidence. The proffered evidence did not in fact illuminate past administrative practices and, in any event, referred to a time prior to the December amendment to G. L. c. 175, § 22H. With respect to (2) above, all license amendments offered were granted prior to the December amendment, with one exception. The record shows that that company did not write insurance for private passenger automobiles in 1975 and, therefore, granting a license amendment would not disrupt the market for such insurance.

8. The final argument advanced by Maryland Casualty is that the Commissioner erred in failing to grant the company a hearing on its administrative appeal. The right of appeal to the Commissioner when an administrative hearing has been conducted by a deputy commissioner is provided by G. L. c. 26, § 7, as amended by St. 1964, c. 174, which requires the Commissioner to "review the case." See *Insurance Co. of N. America* v. *Commissioner of Ins.,* 327 Mass. 745, 753 (1951). We find nothing that would require further hearings before the Commissioner. The statute clearly comprehends only review based on the record before the hearing tribunal. See G. L. c. 30A, § 10. In the cases now before us, the record is clear that the Commissioner had performed this function prior to the receipt of the formal appeal to him, and any further action by the Commissioner would be superfluous.

9. An order is to be entered in each case vacating the Commissioner's decision and order and remanding the cases to the Commissioner for further proceedings consistent with this opinion.

*So ordered.*