## ARNOLD DELUTY vs. COMMISSIONER OF INSURANCE.

Suffolk. June 6, 1978. — February 26, 1979.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Insurance*, Commissioner of Insurance, Revocation of broker's license. *State Administrative Procedure Act. Administrative Law*, Findings by agency, Evidence. *Evidence*, Administrative proceeding.

The standard for revocation of an insurance broker's license set forth in G. L. c. 175, § 166, is sufficiently definite. [90-92]

Where, in a proceeding under G. L. c. 175, § 166, to revoke an insurance broker's license, the hearing officers failed to make findings as to whether the broker was reasonably justified in withholding payment of a disputed bill claimed by an insurance company to be owed by the broker, the case was remanded to the Commissioner of Insurance for further findings or the taking of further evidence or both. [92-95]

In a proceeding under G. L. c. 175, § 166, to revoke an insurance broker's license for failure to pay premiums due an insurance company, there was no merit to the broker's objection to the admission of a billing statement consisting of a computer printout, sent to him by the company. [95-96]

CIVIL ACTION commenced in the Superior Court on February 28, 1977.

The case was heard by *D'Ambrosio*, J., a District Court judge sitting under statutory authority.

*Bernard A. Kansky* for the plaintiff.

*Paul W. Johnson*, Assistant Attorney General, for the Commissioner of Insurance.

GOODMAN, J. The plaintiff, Arnold Deluty, brought an action under G. L. c. 30A, § 14, to review a decision made pursuant to G. L. c. 175, § 166, which revoked his license as an insurance broker. The Superior Court entered a judgment affirming the decision, and this appeal followed. For the reasons set out in part 2 of this opinion we reverse the judgment.

The decision, termed "Statement of Facts, Findings, Order and Decision," was issued on November 1, 1976, following a hearing, held on December 17 and 18, 1975, by two deputy commissioners sitting as hearing officers. Upon appeal to the Commissioner, their decision was affirmed.[1] The decision ordered that Deluty's broker's license be revoked[2] because he "does not maintain the qualifications of trustworthiness, or competency, or suitability as required by Sections 163 and 166 of Chapter 175 of

[1] Neither party raises any question with regard to the fact that the decision was affirmed by another deputy commissioner rather than by the Commissioner. We presume regularity. See G. L. c. 26, § 7 ("In case of a vacancy in the office of commissioner, and during his absence or disability, the first deputy shall perform the duties of the office, or in case of the absence or disability of such first deputy, the deputy who has been longest in the service of the division"). Cf. *Maryland Cas. Co.* v. *Commissioner of Ins.*, 372 Mass. 554, 572 (1977). In this opinion we refer to the decision as that of the Commissioner.

[2] Although the order referred to "all licenses" and to G. L. c. 175, § 163, as well as to § 166, Deluty's complaint in this action for review alleges only the wrongful revocation of his "insurance broker license" and asks that "no suspension or revocation of plaintiff's license be permitted." We assume that the reference is to Deluty's broker's license which, as appears from the transcript of the hearing, he had held since 1967. It also appears from the transcript that since 1972 he had held another license to do business as Marco Insurance Agency. He applied for renewal of that license on May 9, 1974, but the license fee was never paid, and the license was never reissued. Its status is not clear, and it would appear that the decision was meant to apply as well to that license without, however, passing on its viability. No separate argument is made with reference to that license.

Deluty had been, as found in the decision, "appointed as designated agent by the Massachusetts Motor Vehicle Reinsurance Facility [hereinafter Facility] [see G. L. c. 175, § 113I (as appearing in St. 1973, c. 551, § 6)] as agent for the Fireman's Fund American Insurance Companies" (hereinafter company), but this relationship had apparently been terminated by the company on October 21, 1975, when the company took Deluty's "insurance stamp." These circumstances may account for the reference to § 163 in the decision, though we cannot be sure, since we are not told about the relationship between this section and § 113I and regulations issued thereunder.

In any event, we assume that any question that may arise with reference to "other licenses" will be disposed of in a manner consistent with our disposition in this opinion.

the General Laws . . . ." This conclusion was based on subsidiary findings set out in the margin.[3]

1. *The statutory standard.* Deluty first attacks the provision for revocation in § 166 ("The commissioner may . . . for cause shown . . . revoke the license") as lacking in a sufficiently definite standard. However, "for cause shown" is given content by the provision in § 166 that issuance of a license be upon condition that "the commissioner is satisfied that the applicant is trustworthy and competent." This phrase is informed by the concern evinced in G. L. c. 175, § 166B, to prevent conduct which "would be hazardous to the public, his [the broker's] customers or creditors . . . ." See *Bond* v. *Commissioner of Pub. Safety,* 1 Mass. App. Ct. 536, 540 (1973). These provisions also give meaning to the word "suitable" in the first sentence of § 166 that "[t]he commissioner may . . . issue to any suitable person . . . a license to act as an insurance broker . . . ." The commissioner's brief quoted from *Grossman* v. *Grossman,* 343 Mass. 565, 568 (1962) ("suitable person" under G. L. c. 192, § 4): "Basically the term 'suitable person' connotes a person who is considered to have the capacity and the will to [act] . . . with fidelity and efficiency."

---

[3] The "Findings" in this decision state in major part: "We find that Arnold Deluty was appointed as designated agent by the Massachusetts Motor Vehicle Reinsurance Facility as agent for the Fireman's Fund American Insurance Companies. As agent for the Fireman's Fund American Insurance Companies Mr. Deluty placed a considerable amount of insurance business. As of November 12, 1975, a statement was rendered to Mr. Deluty indicating that the amount owed by him to the insurance company for premiums for policies written through his agency was in the amount of $177,039.48. Mr. Deluty failed to pay any of this amount and accordingly owes this amount of money to the insurance company. We find Mr. Deluty admitted to the company that he owed some money although he would not admit to the amount due being $177,039.48. . . .

"Although Mr. Deluty contended that he did not owe this amount, he was given an opportunity to indicate to the insurance company where the amount was inaccurate or which policies were not represented properly and for which accounts no premium was due. Although he was given an opportunity to make corrections, he failed to submit any corrections."

We thus need not decide whether the above quoted phrase from § 166B may go beyond "trustworthiness and competency." We can, for purposes of this case, accept the definition of "suitability" suggested in the Commissioner's brief — "a combination of trustworthiness and competence." Trustworthiness and competence are thus requirements for the issuance of a broker's license (whether or not they are exhaustive); and where the expectations of conduct in accordance with those requirements are not met, revocation is an obvious sanction. Further, the standards function in the context of the insurance business and are addressed to persons who have qualified to carry on that business as brokers (see G. L. c. 175, § 166A). It is not unreasonable for the Legislature to expect that they will know what trustworthiness and competence entail in the conduct of an insurance broker's business.

This is neither a criminal statute nor a statute involving specific constitutional guarantees where greater particularity might be required. See *Henkes* v. *Fisher*, 314 F. Supp. 101, 107 (D. Mass. 1970), aff'd 400 U.S. 985 (1971). Indeed, the Supreme Judicial Court has applied the broader standard in c. 175, § 166B, referred to above, in proceedings to appoint a receiver of an insurance company under G. L. c. 175, § 6, which also incorporates that standard. *Commissioner of Ins.* v. *Century Fire & Marine Ins. Corp.*, 373 Mass. 473, 476-478 (1977). See *Maryland Cas. Co.* v. *Commissioner of Ins.*, 372 Mass. 554, 569 (1977), in which the Supreme Judicial Court reviewed a suspension of the license of an insurance company and applied the standard "whether 'the company's refusal to write motor vehicle liability policies or bonds is contrary to the public interest by disrupting the market for said insurance in the Commonwealth.' " Cases in other jurisdictions have upheld the revocation of insurance brokers' and agents' licenses under statutory standards of similar breadth or broader than (we are not of course to be understood as approving or disapproving such standards) those

applied in this case. See *Knott* v. *State ex rel. Hanks*, 140 Fla. 713, 716-717 (1939) ("such improper or illegal conduct as to render [an agent] unfit to carry on the business or to make his continuance therein detrimental to the public interest" [emphasis omitted]); *Patchett* v. *Baylor*, 62 Ill. 2d 426, 434 (1976) ("fraudulent or dishonest practices"); *Commissioner of Banking & Ins.* v. *Parkwood Co.*, 98 N.J. Super. 263, 273 (1967) ("unworthiness" or "incompetency"); *Richardson* v. *Reese*, 165 Tenn. 661, 666 (1933) ("good cause shown" was interpreted to mean "is unfit to pursue that vocation or is a person of bad moral character").[4]

2. *The decision.* Deluty argues that "[t]he simple act of not paying all or any part of an outstanding disputed bill claimed by an insurance company to be owing to it from an insurance broker" is not ground for revocation of the broker's license. The Commissioner, in his brief, does not appear to contest this formulation as a general proposition but points to the failure of Deluty to indicate specific inaccuracies in the company's November statement that he owed $177,039.48 (see fn. 3) as being "evasionary conduct" indicating untrustworthiness. We have no difficulty with the implicit assumption by the Commissioner that where there is no substantial dispute, intentional withholding of monies due an insurance company by a broker is indicative of untrustworthiness subject to sanctions under § 166 — particularly if that characterization is read in the light of the concern in § 166B to guard against conduct which "would be hazardous to the public, his [the broker's] customers or creditors . . . ." Indeed, G. L. c. 175, § 176, provides that a broker who diverts premi-

---

[4] *Fisher* v. *State Ins. Bd.*, 139 Okla. 92 (1929), on which the plaintiff relies, is distinguishable; it holds merely that the phrase "other bad practices" at the end of a statutory list of causes for cancellations (which includes "that he lacks sufficient ability to properly conduct the business of insurance or that he is incompetent") (92-93) adds nothing to that list (94-95). To the extent that the case expresses views contrary to those in this opinion, we do not follow them.

ums is guilty of larceny and that failure to pay premiums over to an insurance company after a written demand is prima facie evidence of such diversion. Other jurisdictions have imposed sanctions for failure to remit premiums either under specific statutory provisions making such failure a cause for the imposition of sanctions or under more general provisions such as § 166. See *Nuger* v. *Insurance Commr.*, 238 Md. 55, 62, 70 (1964); *Commissioner of Ins.* v. *Shepperd*, 243 Miss. 519, 522, 525-527 (1962); *Pinkston* v. *Insurance Commrs.*, 165 S.W.2d 526, 527 (Tex. Civ. App. 1942); *Commissioner of Banking & Ins.* v. *Parkwood Co.*, 98 N.J. Super. at 268, 272; *Leterman* v. *Pink*, 249 App. Div. 164, 170, rehearing denied sub nom. *Ebenstein* v. *Pink*, 249 App. Div. 730 (1936), aff'd 275 N.Y. 613 (1937); *Russell* v. *Superintendent of Ins.*, 30 App. Div. 2d 749, 750 (N.Y. 1968); *Minnick* v. *Insurance Dept.*, 32 Pa. Commw. Ct. 225, 229 (1977).

Were there nothing more to this case than the decision finding that $177,039.48 was due and that the only justification given for not paying it was a vague protestation that the amount was inaccurate, we would be inclined to affirm the decision — though it might give us pause that the decision tells us nothing of Deluty's operation except that he had been appointed as designated agent for the company and as such agent had "placed a considerable amount of insurance business." (Eight hundred thousand dollars per year is mentioned in the transcript.)

In this case the transcript of the hearing contains a great deal about the relationship between Deluty and the company. It was obviously not a happy one. Deluty's problems with the company began in January, 1975, when the company automatically renewed every policy he had written for 1974 and billed him on that basis. Subsequently, the Facility (see fn. 2) determined that the company had overcharged Deluty by approximately $500,000. On June 12, 1975, Deluty's office manager wrote the company regarding five categories of credits totalling $129,-455.03 to which he claimed to be entitled. During the

revocation hearing, the company official who handled agency relationships for the company, could show only that of this amount, Deluty had received a cash credit of $21,427.28. The official did not have the accounting records, which were kept in Newark, New Jersey, but he testified that he believed that most of the credits had appeared on Deluty's July statement. In September, 1975, the company informed Deluty for the first time of an $80,000 unpaid balance from 1974. By October, 1975, the company claimed that the balance owed was $169,-952.21. Deluty testified that he had asked the company to furnish him with a computer tabulation of all the business which he had written for them and had offered to pay the cost. However, the company did not furnish the tabulation, although Deluty testified he was in constant communication with the company as early as June, July and August, requesting that it be furnished to him.

The decision is devoid of findings on these matters, and we do not know which of the conflicting testimony the hearing officers and the Commissioner accepted and which they deemed irrelevant. Their finding that $177,-039.48 was due, even if taken as a resolution of the June dispute, does not settle the question whether the plaintiff was reasonably justified in pressing this matter by October and November of 1975, or whether he knew that no substantial credits were due him, so that his protestations were indeed a sham. It is not for us to make findings on these matters. Their significance depends on evidence, much of which is far from clear, and which must be evaluated in the light of business practices which the hearing officers and the commissioner would be expected to know. In *Maryland Cas. Co.* v. *Commissioner of Ins.*, 372 Mass. at 566, the court pointed out that "General Laws c. 30A, § 11(8), inserted by St. 1954, c. 681, § 1, requires that '[e]very agency decision ... shall be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision.' " The court went on to quote from *School Comm. of*

*Chicopee* v. *Massachusetts Commn. Against Discrimination*, 361 Mass. 352, 354-355 (1972), as follows: "[W]here the evidence is conflicting, the administrative agency is charged with the responsibility of making findings of fact and is in the best position to judge the credibility of the witnesses. . . . However, that rule does not relieve an agency of its duty to make subsidiary findings of fact on all issues relevant and material to the ultimate issue to be decided. Nor does it relieve the agency of the duty to set forth the manner in which it reasoned from the subsidiary facts so found to the ultimate decision reached . . . . In the present case, no subsidiary findings were made on important portions of evidence which, in our view, are relevant and material to the ultimate decision reached by the Commission." *Maryland Cas. Co.* v. *Commissioner of Ins.*, 372 Mass. at 567. See *Selectmen of Framingham* v. *Civil Serv. Comm.*, 366 Mass. 547, 554 (1974) ("It would in all events be doubtful wisdom, except possibly in the clearest of cases, for a judge to act without the benefit of a judgment on such material questions by the commission with its specialized function . . ."). Cf. *Katz* v. *Massachusetts Commn. Against Discrimination*, 365 Mass. 357, 362-363 (1974).

3. *The computer printouts.* There is no merit in Deluty's objection to the admission at the hearing of the billing statement of November 1, 1975, sent by the company to him, consisting of a twenty-eight page computer printout showing a list of policies and a total due of $177,039.48. Deluty's sole objection is that the admission of the statement was in violation of c. 30A, § 11(2).[5] It is clear from the transcript — quite apart from the expert knowledge of the agency about such matters — that this is the "kind of evidence on which reasonable persons are accustomed

---

[5] General Laws c. 30A, § 11(2), provides in pertinent part: "[A]gencies need not observe the rules of evidence observed by courts . . . . Evidence may be admitted and given probative effect only if it is the kind of evidence on which reasonable persons are accustomed to rely in the conduct of serious affairs."

to rely in the conduct of serious affairs." There was testimony that it has been a custom and a practice of the company to render these statements to their agents monthly, and that it is the generally accepted practice in the insurance industry to use computer printouts. The plaintiff refers to these in his brief as "business records," but they were apparently not offered under G. L. c. 233, § 78 (see G. L. c. 233, § 79E). We do not intimate that they would not qualify for admission under those statutes. See discussion in Manual for Complex Litigation § 2.716 (West 1977).

4. *Other contentions.* We have examined the other contentions made by the plaintiff and find that they are without merit. They either do not rise to the level of argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), or have no basis in the transcript, or were not timely raised, or are otherwise so insubstantial as not to require discussion.

5. Accordingly, the judgment of the Superior Court is reversed in accordance with part 2 of this opinion, and a new judgment is to enter remanding the matter to the Commissioner for further proceedings, which may include further findings or the taking of further evidence or both. See G. L. c. 30A, § 14(7); *School Comm. of Chicopee* v. *Massachusetts Commn. Against Discrimination,* 361 Mass. at 355.

*So ordered.*