OPINION OF THE COURT
Bentley Kassal, J.
ISSUE
The issue in this action is whether the plaintiff, Superintendent of Insurance of the State of New York (Superintend *858 ent), may compel the defendants Safeco Insurance Company of America (Safeco) and First National Insurance Company of America (First National) to continue to do business as insurance carriers in this State.
FACTS
The defendant insurance companies are headquartered and incorporated in the State of Washington. Both are wholly owned subsidiaries of Safeco Corporation, a publicly held Washington company, whose holdings, in numerous States, include, among others, property, auto and other casualty insurance companies, title insurance companies, and a life insurance company.
Safeco and First National have been licensed to do business in New York continuously since 1954 and 1929, respectively. Their business here consists primarily of personal lines of insurance: automobile (no-fault, liability and physical damage), homeowners, marine and dwelling fire policies, and related forms of coverage. At present, the defendants have outstanding approximately 74,000 policies in New York, most of which are automobile and homeowners policies.
Beginning in 1973 and continuing into 1975, the insurance industry, in general, sustained serious underwriting losses throughout the country and, in that period, the defendants suffered approximately $52,000,000 in losses nationally. This trend began to reverse itself nationally in 1976 and 1977 when the defendants earned profits of approximately $30,000,000 and $60,000,000, respectively. However, in New York, the pattern proved to be quite different in that their underwriting losses increased yearly and, these losses were $3,387,000 in 1976 and $3,910,000 in 1977. In the first quarter of 1978, losses have been $772,000. Thus, in spite of a turnaround on the national level, business in New York for the defendants continued to be an unabated losing venture. The straw which broke the camel’s back here, according to defendants, was the declaration by the Superintendent of Insurance of a moratorium on automobile liability policy rate increases in February, 1978.
In May, 1978, the defendnts decided to terminate all of their business activities in New York. On June 7, 1978, representatives of the defendants met with the Superintendent of Insurance, attempted to surrender their licenses to do business here and advised the Superintendent they would not file for re *859 newal of the licenses upon their expiration on July 1, 1978. On tendering the licenses, defendants also proposed a plan for an orderly phase-out of their business here, including, inter alia, the continuation of existing policies until the next expiration date.
On June 9, 1978, the Superintendent of Insurance again met with the representatives of the defendants and advised them that they did not. have the right to surrender or not to renew their licenses, since they would then be in violation of the New York Insurance Law. When the defendants persisted in their position that they were no longer licensed to conduct an insurance business in New York, the plaintiff commenced the present proceeding, pursuant to section 35 of the Insurance Law, for injunctive relief to prevent the defendants from violating the Insurance Law and causing irreparable injury to the interests of the people of this State. After submission of the original motion for a preliminary injunction, defendants moved for summary judgment, dismissing the complaint and declaring their right to surrender their licenses and terminate their business in this State.
(The defendants’ business losses in the State of New Jersey were similar to those in New York but to a greater degree. In this jurisdiction, since 1969, the defendants have lost a sum in excess of $7,000,000 while they have lost more than $13,000,-000 in New Jersey in the same period. In view of this, defendants apparently did seek and have obtained permission from the New Jersey Insurance Commissioner to withdraw from business in that jurisdiction. This incidental observation is noteworthy but is neither persuasive nor controlling here.)
STATUTORY PROVISIONS RELIED UPON BY PLAINTIFF
(1) SECTION 35 OF THE INSURANCE LAW
This section authorizes the Superintendent to prosecute an action to enjoin an insurer from violating the provisions of the Insurance Law and authorizes the court to grant preliminary or permanent injunctive relief where the alleged violation may cause irreparable injury to the interests of the people of this State.
(2) ARTICLE 6 OF THE VEHICLE AND TRAFFIC LAW
This article, the Motor Vehicle Financial Security Act, is the compulsory automobile insurance law, which requires that all motorists maintain liability insurance or other security for *860 damages resulting from the use of a motor vehicle. Any motorist who fails to maintain an insurance policy (or other proof of security not relevant here) "issued by an insurer duly authorized to transact business in this state” (Vehicle and Traffic Law, § 311, subd 4, par [b]) may have his vehicle registration or operator’s license revoked by the Commissioner of Motor Vehicles (Vehicle and Traffic Law, § 318) and may also be guilty of a misdemeanor (Vehicle and Traffic Law, § 319).
The Superintendent argues that, by surrendering their licenses, defendants would not be licensed insurers, and this would immediately and automatically subject their insureds to all of the penalties of this article. Although this situation is apparently not expressly covered by any provisions of the Insurance Law or the Vehicle and Traffic Law, the Superintendent’s interpretation is not reasonable, logical or necessary. So long as an insurer is "authorized” at the time of issuance of a policy, it has been consistently held that the rights and obligations under that policy are not impaired by reason of a subsequent termination of such authority. (See, e.g., American Fid. Co. v Leahy, 189 App Div 242, 245-246, affd 233 NY 628; People v Empire Mut. Life Ins. Co., 92 NY 106; Waterman Corp. v Johnston, 275 App Div 798, mot for lv to app den 275 App Div 922; Woodward v Mutual Reserve Life Ins. Co., 178 NY 485, app dsmd 200 US 623.)
Further, in view of the lack of a specific legislative direction to the contrary, the Superintendent is "invested with the rights, powers and duties * * * reasonably implied by [the Insurance Law], in connection with the business of insurance in this state” (Insurance Law, § 10) including broad power to interpret, clarify, and implement the legislative policy reflected in the provisions of the Insurance Law (Insurance Law, § 21, subds [b], [c]). (Breen v Cunard Lines S. S. Co., 33 NY2d 508; Ostrer v Schenck, 41 NY2d 782.) Thus, the consequences of the defendants’ surrendering of their licenses are not so automatic and drastic as the Superintendent suggests, since he does have the power to ameliorate such consequences by providing that the rights of existing policyholders remain otherwise unimpaired, while permitting the defendants to phase out their business in an orderly fashion. If not, it would be impossible for such a carrier to ever discontinue its activities here.
*861 (3) SECTION 167-A OF THE INSURANCE LAW
The most compelling statutory provision, relied upon by the Superintendent, is section 167-a of the Insurance Law. Unlike the other cited provisions, this law expressly requires that automobile insurance companies, like the defendants, renew automobile insurance policies and, accordingly, it warrants careful review.
In 1973, the Legislature enacted the Comprehensive Automobile Insurance Reparations Act (Insurance Law, art 18; L 1973, ch 13), commonly referred to as the "No-Fault Act”. (See, generally, Montgomery v Daniels, 38 NY2d 41; CountryWide Ins. Co. v Harnett, 426 F Supp 1030, affd 431 US 934, for a general discussion of that law as well as the constitutionality of various specific provisions.) As part of the legislative package, section 167-a of the Insurance Law was also amended (L 1973, ch 13) to require, in substance, that all automobile policies (and certain other personal risk policies) in effect before August 1, 1973, be automatically renewable for three successive one-year periods (unless the insured failed to pay the premium or a driver’s license or registration was suspended or revoked). The purpose of this provision was the continuance of an orderly market during the early years of no-fault. (See Memorandum of State Insurance Department, NY Legis Ann, 1976, pp 290-292.) The provision was considered again by the Legislature and re-enacted when various provisions of the Insurance Law were consolidated in 1974. (L 1974, ch 1072; NY Legis Ann, 1974, 219, pp 432.)
In 1976, as the final anniversary dates were about to be reached under the prior three-year extensions, the Legislature extended the provision for automatic renewal of automobile policies for one more year. (L 1976, ch 348.) The rationale for this extension was: "to (a) avoid massive market disturbance beginning August 1, 1976; (b) permit the continued development of a body of no-fault experience which at present is unstable and not fully matured; and (c) permit insurers to eliminate demonstrably bad risks.” (Memorandum of State Insurance Department, NY Legis Ann, 1976, p 292.) The scenario which the Legislature sought to avoid was a massive "dumping” of insureds who would be unable to replace their coverage in the voluntary market and who would be forced to seek coverage under the assigned risk plan. (Memoradum of State Insurance Department, NY Legis Ann, 1976, p 290.)
Apparently the needed experience under no-fault was slow *862 in arriving, so in 1977, the Legislature granted another one-year extension of the renewal provisions. (L 1977, ch 214.) Finally, in June of this year, on the eve of the fifth anniversary of the pre-no-fault policies, another one-year extension was granted. (L 1978, ch 429.) This time, the Legislature expressly directed the Superintendent, after public hearing, to report to it and to the Governor no later than March 1, 1979, evaluating the operation of section 167-a of the Insurance Law and making recommendations in regard thereto. (L 1978, ch 429.) When viewed in terms of the past history of legislative action in regard to this law, as well as the general response to such reports, there is no reason to assume that the automatic renewal provision will or will not be permitted to expire in 1979. However, that aspect is not controlling.
The Superintendent argues that the defendants had the opportunity to opt out of certain of the policies prior to the effective date of the first renewal requirement under the original three-year extension on July 31, 1973. (L 1973, ch 13.) The decision made by the defendants six years ago without notice of the three subsequent extensions (L 1976, ch 348; L 1977, ch 214; L 1978, ch 426) can hardly be considered as a perpetual waiver of their rights nor was such a procedure reasonably calculated to afford the defendants due process in view of the subsequent extensions.
(4) OTHER STATUTES AND CONTRACTUAL PROVISIONS
The Superintendent poses a number of other potential consequences (or as defendants call them a "parade of horribles”) which may result from the defendants’ surrender of their licenses. He suggests that: holders of homeowners and fire policies may be in violation of their mortgage or lease provisions; holders of "Umbrella Policies” might have their coverage voided; agents and brokers will not be entitled to commissions on defendants’ policies and "would be subject to being charged with the violation of Section 112 of the Insurance Law by virtue of their acting for or aiding and abetting and receiving commissions from an unlicensed insurer.”
These consequences are certainly avoidable without difficulty or complication since the Superintendent does have broad authority, as discussed above, which, on a feasible basis, would permit defendants to operate with a license/authority for an interim transition period during which appropriate safeguards would be adopted and existing policies would be deemed to comply with the relevant statutory and contractual *863 requirements. Other aspects of these related problems can similarly be worked out on a pragmatic basis.
The Superintendent also cites sections 333 and 334 of the Insurance Law which require that an insurer be licensed in order that insureds and claimants be protected by the Property and Liability Insurance and Security Fund, and section 63 of the Insurance Law which requires an insurer to accept assignments under the assigned risk plan and issue three-year coverage to motorists who cannot find placement in the voluntary market. Again, the Superintendent’s interpretation creates an unreasonable "catch 22”, which would prevent any insurer from ever terminating its business in this State in spite of the fact that there is no express legislative policy warranting such a drastic result.
CONSTITUTIONALITY
(1) superintendent’s powers of regulation
In evaluating any particular constitutional objection to governmental regulation of the insurance business, several critical principles must be recognized. First, it must be acknowledged that insurance is "a business to which the government has long had a 'special relation’ ”. (California Auto. Assn. v Maloney, 341 US 105, 109.) Since the public interest and general welfare of the public have been found to require the regulation of the insurance industry to provide adequate protection, it is properly subject to the exercise of the government’s police power (Country-Wide Ins. Co. v Harnett, 426 F Supp 1030, 1035, supra; California Auto. Assn. v Maloney, supra, pp 109-110; Insurance Co. v Glidden Co., 284 US 151, 157-158; Health Ins. Assn. of Amer. v Harnett, 44 NY2d 302, 308-309) or possibly a broader power than the police power. (See, generally, Health Ins. Assn. of Amer. v Harnett, supra, p 310; People v Formosa, 131 NY 478.) Finally, "the business of writing insurance is not a right; it is a privilege granted by the State subject to the conditions imposed by the State and to its control and supervision”. (Matter of People [International Workers Order], 199 Misc 941, 967, affd 280 App Div 517, affd 305 NY 258, cert den 346 US 857.)
As outlined above, by express provisions of law or by interpretation and regulation of the Superintendent, the defendants have been caught in a maze from which they have been unable to extricate themselves. As defendants point out, *864 which the Superintendent does not deny, this catch-22 is even more ironic since the Superintendent clearly does have the power to suspend or refuse to renew the defendants’ licenses (Insurance Law, § 40), which would have the same effect on the insurance market as if the defendants voluntarily withdrew. Thus, they are apparently being held captive here, against their will, because they have, in fact, properly performed their obligations.
Where the legislative and executive branches have acted, the judiciary may not lightly interfere, merely because the court questions the wisdom or propriety of such action or policies. Even though the laws or regulations may appear ironic or illogical in that they prevent the defendants from withdrawing from business here, this court is bound to uphold such laws and regulations unless their constitutional rights are being violated thereby, as defendants contend.
(2) DUE PROCESS
Clearly, the power of the State to regulate insurance companies is not absolute — an insurer is still entitled to due process of law. (See, generally, Munn v Illinois, 94 US 113; Moore v Metropolitan Life Ins. Co., 33 NY2d 304; Health Ins. Assn. of Amer. v Harnett, supra.)
Due process, as involved here, consists of two important concepts. First, the Fifth Amendment of the United States Constitution, applied to the States through the Fourteenth Amendment, and section 7 of article I of the New York State Constitution, prohibit the taking of private property for public use, without just compensation. The "taking” need not be direct or de jure, but may be de facto, consisting of a regulatory scheme so onerous and burdensome as to substantially diminish the value of the property, deprive the property owner of the ability to obtain a fair rate of return on its investment or convert the property to a public use by denying the owner of private control. (See Matter of Keystone Assoc, v Moerdler, 19 NY2d 78; Matter of Charles v Diamond, 41 NY2d 318.)
Second, the Fourteenth Amendment of the United States Constitution and section 6 of article I of the New York State Constitution, guarantee that no person shall be deprived of property without due process of law. Again, the deprivation need not be direct, but may consist of regulations which arbitrarily, unreasonably and without sufficient public purpose, deprive the owner of the benefits of his property. *865 (Brooks-Scanlon Co. v Railroad Comm., 251 US 396; Montgomery v Daniels, 38 NY2d 41, supra; Matter of Charles v Diamond, supra.)
(3) CONSTITUTIONAL PRECEDENTS
Beyond the general constitutional principles discussed above, the parties have cited several cases in which the constitutionality of the no-fault law has already been tested.
In Montgomery v Daniels (supra), the Court of Appeals upheld the constitutionality of the no-fault "threshold” requirements for the right to a jury trial of a tort action based upon an automobile accident. Also, in Corsa & Son v Harnett (92 Misc 2d 569), the Supreme Court, Nassau County, upheld the constitutionality of subdivision (9) of section 167-a of the Insurance Law, which requires that insurance brokers and independent agents renew automobile policies of their insured. In essence, the court found that the State could properly limit an agent’s right to choose to handle only a profitable line of insurance while rejecting other, less profitable lines. Thus, in neither of these cases was the court called upon to determine the specific questions raised herein.
In Country-Wide Ins. Co. v Harnett (426 F Supp 1030, supra), however, a three-Judge constitutional panel of the United States District Court, Southern District of New York, did consider one aspect of the provisions involved herein. In that case, two provisions of the no-fault law were challenged. The first provisions, permitting compulsory arbitration of certain disputes at the demand of any claimant, is not relevant here. The second provision — the requirement for automatic renewal of certain automobile policies (Insurance Law, § 167-a) — was challenged as a violation of the contract clause (art I, § 10) of the United States Constitution.
Citing the broad power of the government to regulate the insurance industry, the Southern District panel held that the automatic renewal provisions accomplished a legitimate public goal of ensuring an orderly market during the early years of no-fault and that the insurance companies’ contract rights must yield to it. (Country-Wide Ins. Co. v Harnett, supra, p 1035.)
However, there are two substantial reasons, inter alia, why the decision in the Country-Wide case is not determinative of the present action.
First, the temporary provision for automatic renewal of *866 policies at issue in Country-Wide provided for a total of no more than five years of extensions. (Country-Wide Ins. Co. v Harnett, supra, p 1035, n 15.) That provision has now been extended for another year making a total of six years at this point. (As to the possibility of future extensions, another piece of "Temporary”, "emergency” legislation, the New York City residential rent control law, which was enacted over 30 years ago remains in effect to this day.)
Second, an important distinction is that these defendants do not seek to reap the benefits of doing business here while "dumping” unprofitable automobile policies, or even all automobile policies, while retaining other presumably profitable areas of insurance coverage. This is contrary to the fact pattern recited in the Memorandum of the State Insurance Department, which is cited as the factual basis of the court’s determination in Country-Wide Ins. Co. v Harnett (supra, p 1035, nn 14, 15; cf. Corsa & Son v Harnett, supra; Health Ins. Assn. of Amer. v Harnett, 44 NY2d 302, supra). Rather, here they seek to withdraw completely from conducting any insurance business in this State. There is no attempt to retain selective or lucrative risks here.
Finally, the defendants’ claims of continuing substantial operating losses, and the Superintendent’s moratorium on rate increases, must be considered as additional persuasive factors in the present case.
CONCLUSION
This court does not find that any of the individual statutes involved herein, including section 167-a of the Insurance Law, are unconstitutional on their face. However, I do find that the interpretation of the cited statutory provisions, as enforced by the Superintendent and applied to these defendants, does indeed conscript and compel them to continue doing business at a loss in this State in violation of their rights to due process under the Fourteenth Amendment of the United States Constitution and section 6 of article I of the New York State Constitution.
Having made this determination, it is, therefore, unnecessary to determine the further issue of whether the Superintendent’s application of these laws has crossed the threshold of appropriating the defendants’ property without just compensation, in violation of the Fifth Amendment of the United States Constituion and section 7 of article I of the New York *867 State Constitution. (See, generally, French Investing Co. v City of New York, 39 NY2d 587, app dsmd 429 US 990.)
The Superintendent has failed to demonstrate that his interpretation and application of the laws to the defendants has a fair, just and reasonable connection with the public welfare, an essential test of due process. (Montgomery v Daniels, 38 NY2d 41, supra; Health Ins. Assn. of Amer. v Harnett, supra.) Absent the most severe and grave public emergency, the State may not compel a corporation to conduct a business against its choosing. (Health Ins. Assn. of Amer. v Harnett, supra, p 313-314.) Even in the highly regulated business of insurance, the insurer must retain some choice as to how it will conduct its business. When the State controls the terms of the coverage, while denying the right to terminate or raise premiums, that choice becomes illusory. (Health Ins. Assn. of Amer. v Harnett, supra; Moore v Metropolitan Life Ins. Co., 33 NY2d 304, supra.)
Finally, the fact that the defendants once submitted to government control, by applying for licenses which gave them the privilege of engaging in the insurance business in this State, does not mean that they must be forever in bondage, subject to such control. As stated by the Supreme Court, in a case where a State chartered railroad sought to discontinue its business: "It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfil an obligation imposed by the charter even though fulfilment in that particular may cause a loss. Missouri Paciñc Ry. Co. v. Kansas, 216. U. S. 262, 276, 278. But that special rule is far from throwing any doubt upon a general principle too well established to need further argument here. The plaintiff may be making money from its [other businesses in the state] but it no more can be compelled to spend that than it can be compelled to spend any other money to maintain a railroad for the benefit of others who do not care to pay for it. If the plaintiff be taken to have granted to the public an interest in the use of the railroad it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss. Munn v. Illinois, 94 U. S. 113, 126.” (Brooks-Scanlon Co. v Railroad Comm., 251 US 396, 399, supra.)
DECISION
The defendant has the right to terminate its business here *868 and the Superintendent has the obligation to assure that- such termination is orderly and not unnecessarily disruptive.* Thus, the Superintendent had the authority to reject the immediate surrender of defendants’ licenses, but could not deny this relief absolutely or indefinitely. As suggested by defendants, the Superintendent does have sufficiently broad power to develop a viable plan for defendants’ speedy withdrawal from business in this State with assurances that current policyholders will not be unduly, adversely affected.
Such a plan, inter alia, should incorporate provisions, to the effect that defendants:
(1) Will have a limited license/authority to continue in business in this State for the limited purposes of servicing existing policies for the remainder of their respective terms and to renew certain other policies for a short period so that during such periods, those presently insured may be able to obtain follow-up coverage;
(2) Will not voluntarily issue any new policies;
(3) Will be permitted to surrender its license/authority at the termination of such period(s) if they have fully performed their obligations hereunder.
Under such terms, the defendants should be permitted to surrender their licenses, but remain "authorized” for the limited purposes stated herein.
Settle a judgment consistent with this decision, incorporating a proposed plan for withdrawal and the declaratory relief sought by defendants in their answer. All other relief sought by either party, not expressly granted, is denied. Pending entry of the final judgment, the temporary restraining order previously granted shall remain in effect.

 As stated by defendants’ counsel at oral argument, which was not disputed, the defendants collectively have less than 1% of the total automobile insurance in this State.