248 N.J. Super. 616 (1991)
591 A.2d 1005
IN THE MATTER OF THE "PLAN FOR ORDERLY WITHDRAWAL FROM NEW JERSEY" OF TWIN CITY FIRE INSURANCE COMPANY.
Superior Court of New Jersey, Appellate Division.
Argued March 26, 1991.
Decided June 11, 1991.
*619 Before Judges BRODY, GRUCCIO and D'ANNUNZIO.
Wesley S. Caldwell, III, argued the cause for appellants Twin City Fire Insurance Company, et al. (LeBoeuf, Lamb, Leiby & MacRae, attorneys; Wesley S. Caldwell, of counsel and on the brief).
Jack M. Sabatino, Assistant Attorney General, argued the cause for respondent New Jersey Department of Insurance (Douglas S. Eakeley, Acting Attorney General, attorney; Jack M. Sabatino, of counsel; Stephen P. Tasy and Carol Johnston, Deputy Attorneys General, on the brief).
*620 Elmer M. Matthews argued the cause for Amicus Curiae American Insurance Association (Clapp & Eisenberg, attorneys; Elmer M. Matthews, Frederic S. Kessler and Harvey C. Kaish, on the brief).
The opinion of the court was delivered by BRODY, J.A.D.
The Legislature enacted the Fair Automobile Insurance Reform Act of 1990, L. 1990, c. 8 (Reform Act), to reduce the high cost of mandatory passenger automobile insurance. Among the strategies for accomplishing this goal, the Reform Act provides for phasing out what the Legislature identified as an unnecessary component of that high cost: maintaining the New Jersey Automobile Full Insurance Underwriting Association, commonly known as the Joint Underwriting Association or JUA. The JUA had been legislatively created with the expectation that it would be a fairer alternative to the assigned-risk plan that had provided insurance at higher premiums to drivers rejected by private passenger automobile insurers as bad risks. However, by the time the Reform Act was enacted in 1990, the JUA had amassed a debt of 3.3 billion dollars, despite subsidies derived from annual assessments on private passenger automobile insurance policies, and had accumulated a population of insureds numbering more than one-half of all New Jersey drivers.
The Reform Act provides for retiring the JUA debt by various means including assessing the New Jersey Property-Liability Guaranty Association 160 million dollars a year for seven years and imposing a 5% surtax on private passenger automobile insurance premiums, payable by the insurers, for three years. The Reform Act does not permit insurers to pass through to their policyholders the cost of either the assessments or the surtaxes.
The Reform Act also provides for replacing the JUA with the former assigned-risk plan for bad drivers, who will again pay *621 higher premiums but whose numbers are to be limited to no more than 10% of all New Jersey drivers. This depopulation of the JUA and cap on the number of assigned risk drivers is to be accomplished over a two-year period by requiring private passenger automobile insurers to lower their standards for writing policies in the voluntary market. For a full history of the JUA and a description of the statutory program for shifting the bulk of its drivers to the voluntary market see I/M/O Assignment of Exposures to the Aetna Casualty and Surety Company, 248 N.J. Super. 367, 372-375, 591 A.2d 631, 634-636 (App.Div. 1991).
Some private passenger automobile insurers have sought to avoid the burdens of bailing out and depopulating the JUA by attacking the constitutionality of these statutory provisions and by attempting to withdraw from the New Jersey private passenger automobile insurance market. So far the Commissioner of Insurance has stymied insurers' attempts to withdraw from the market by invoking the provisions of Section 72 of the Reform Act, N.J.S.A. 17:33B-30 (hereafter Section 72), that are designed to discourage and delay withdrawal.
The Supreme Court has held that despite the statutory prohibition against passing through the cost of the assessments and surtaxes to their policyholders, insurers may nevertheless obtain relief in particular cases through the rate-making process in order to assure a constitutionally-required fair rate of return. State Farm Mutual Insurance Co. v. State, 124 N.J. 32, 590 A.2d 191 (1991). This appeal is concerned solely with the constitutionality of Section 72 and the lawfulness of the Commissioner's implementation of its provisions respecting Twin City Fire Insurance Company and its affiliates in the ITT Hartford Group holding company (referred to collectively as appellants), all of whom are foreign insurers authorized to write insurance in New Jersey by N.J.S.A. 17B:23-1. Appellants' arguments are supported and augmented by the arguments of amicus American Insurance Association. Except as noted, we will not distinguish between the arguments of appellants and amicus.
*622 Twin City writes about 1% of all New Jersey private passenger automobile policies. It also writes commercial vehicle insurance in this State. Its Hartford affiliates write substantial amounts of other lines of casualty and liability insurance in this State. A week before the Reform Act was enacted on March 12, 1990, Twin City attempted to surrender to the Commissioner its license to write private passenger automobile insurance in New Jersey and sought permission to issue nonrenewal notices to its policyholders. The Commissioner, relying on the withdrawal provisions of Section 72, which include a provision rendering Section 72 retroactive to January 25, 1990, issued an order for orderly withdrawal containing several conditions that Twin City must meet before its withdrawal becomes effective.
Appellants object to four of the conditions, relevant portions of which appear in footnotes that follow. One condition requires Twin City to place its private passenger automobile policyholders with other insurers before issuing notices of nonrenewal. If Twin City is unsuccessful in making these placements within five years, it may then issue notices of nonrenewal. Its withdrawal from the market does not become effective until all its policies have expired.[1] A second condition simply makes it clear that Twin City, as a private passenger automobile insurer, must continue to comply with all insurance *623 laws, including the JUA bailout and depopulation provisions of the Reform Act, until its withdrawal becomes effective.[2] A third condition requires Twin City to stop writing commercial vehicle insurance.[3] The fourth condition requires all other members of the ITT Hartford Group to stop writing the lines of insurance that they sell in New Jersey.[4]
*624 The statutory authority for imposing these conditions is purportedly found in Section 72, which provides:
An insurance company of another state or foreign country authorized under chapter 32 of Title 17 of the Revised Statutes to transact insurance business in this State may surrender to the commissioner its certificate of authority and thereafter cease to transact insurance in this State, or discontinue the writing or renewal of one or more kinds of insurance specified in the certificate of authority, only after the submission of a plan which provides for an orderly withdrawal from the market and a minimization of the impact of the surrender or discontinuance on the public generally and on the company's policy holders in this State. The plan shall be approved by the commissioner before the withdrawal or discontinuance takes effect. In reviewing a plan for withdrawal under this section, the commissioner shall consider, and may require as a condition of approval, whether some or all other certificates of authority issued pursuant to chapter 17 or 32 of Title 17 of the Revised Statutes held by the company or by other companies in the same holding company as the company submitting the plan should be surrendered. The certificate of authority of the company shall be deemed to continue in effect until the provisions of the approved plan have been carried out. The provisions of this section shall apply to any request for withdrawal, surrender or discontinuance filed on or after January 25, 1990.
We reject appellants' arguments that Section 72 is unconstitutional, and, with one exception, its arguments that the Commissioner unlawfully implemented Section 72 in this case.

I.
We turn first to the arguments that Section 72 is unconstitutional.
Before discussing each particular argument, we hold that the Section 72 provision that renders Twin City's affiliates subject to the Commissioner's order is not defective simply because the affiliates are separate corporate entities. Twin City has acknowledged that it and its affiliates are "under common management" of "the parent insurance company, Hartford Fire Insurance Company," which in turn is owned by the ITT Hartford Group. When considering whether the Legislature may constitutionally respond to a problem in the private passenger *625 automobile insurance market by limiting appellants' business in other lines, it is not legally significant that appellants chose to write those other lines through separate corporate entities having common owners rather than writing all their lines through one corporate entity.

A.
Appellants' first argument is that by authorizing the Commissioner to bar Twin City and its affiliates from writing other lines of insurance as the price for permitting Twin City to withdraw from the private passenger automobile insurance market, Section 72 authorizes unconstitutional takings of property without just compensation. The Fifth Amendment of the United States Constitution and the New Jersey Constitution, N.J. Const. of 1947, art. I, para. 20, expressly provide that private property shall not be taken for public use without just compensation. "The protections afforded under both constitutions are coextensive." Littman v. Gimello, 115 N.J. 154, 161, 557 A.2d 314 (1989), cert. denied, ___ U.S. ___, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989).
Applied to this case, the constitutional prohibition raises questions of whether appellants' licenses to write other lines of insurance are private property and whether requiring appellants to choose between surrendering those licenses and writing private passenger automobile insurance constitutes a taking. We need not decide whether appellants' licenses to write other insurance are private property protected by the taking clauses because the choice given appellants by Section 72 does not constitute a "taking."
The United States Supreme Court has identified the factors that must be considered to determine whether a governmental regulation limiting the use of private property so destroys its value as to constitute a taking. There was no taking when the City of New York, in order to preserve Grand Central Station as a landmark, prohibited its owners from topping it with a *626 high-rise office structure. Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), reh'g denied 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). That opinion requires us to make "essentially ad hoc, factual inquiries" involving factors of "particular significance":
The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. [Citation omitted.] So, too, is the character of the governmental action. A `taking' may more readily be found when the interference with property can be characterized as a physical invasion by government [citation omitted] than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good. [438 U.S. at 124, 98 S.Ct. at 2659.]
Accord Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224-225, 106 S.Ct. 1018, 1025-1026, 89 L.Ed.2d 166, 179 (1986) (sustaining federal government's authority to compel employers to make additional contributions to a federal fund guaranteeing payment of private pension funds).
We first examine the character of the governmental action. Requiring appellants to discontinue writing all other lines of insurance as the price for discontinuing to write private passenger automobile insurance cannot be characterized as a "physical invasion." Rather it is part of "a public program adjusting the benefits and burdens of economic life to promote the public good."[5] Thus, as was the case in Penn Central and Connolly, the action may not "readily be found" to be a taking.
Appellants rely on Nollan v. California Coastal Commission, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), where the Court found that there was a taking. The case is distinguishable because there the State's action was a physical invasion, the taking of a public easement over the owner's real property.[6] When the character of the governmental action "is a permanent physical occupation of property, our cases uniformly *627 have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-435, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868, 882 (1982) (New York City ordinance compelling landlords to allow cable T.V. hookups constitutes a physical invasion that was therefore a taking); Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (government regulation compelling owner to allow public to use marina constitutes a physical invasion and was therefore a taking).
Appellants contend that the economic impact of having to give up writing other lines of insurance is the complete destruction of their other-lines business, which generated premiums of about 280 million dollars in 1989. We disagree. Section 72 does not require appellants to give up their other-lines business unless they choose to do so by voluntarily giving up their private passenger automobile line. Appellants' losses, if any, from choosing to continue to write private passenger automobile insurance, the choice Section 72 is designed to encourage, would be the reduction of profits that the JUA bailout and depopulation provisions of the Reform Act might cause. Such losses are not takings. The "loss of future profits  unaccompanied by any physical property restriction  provides a slender reed upon which to rest a takings claim." Andrus v. Allard, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210, 223 (1979).
Appellants also claim that Section 72 "has interfered with distinct investment-backed expectations," a kind of economic impact identified by Penn Central as evidence of a taking. Their argument, however, does not go beyond complaining of the loss of their other-lines business. Interference with distinct investment-backed expectations does not occur whenever there is a loss of expected profits. See State Farm Mutual, supra, 124 N.J. at 48-50, 590 A.2d 191, 199-200. It occurs only when the government has made a specific promise to induce investment *628 in an enterprise and then later, after investments have been made in reliance on that promise, the government reneges.
For instance, in Ruckelshaus v. Monsanto Co., 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), federal law required Monsanto, a manufacturer of pesticides, to submit research data, developed at great expense, to a federal regulatory agency. The federal act contained assurances that data submitted after 1972 would not be disclosed to competitors. A 1978 amendment limited the period of nondisclosure to ten years. The Court found that government disclosures of data submitted from 1972 to 1978 defeated Monsanto's reasonable investment-backed expectations and therefore constituted a taking. 467 U.S. at 1013, 104 S.Ct. at 2878, 81 L.Ed.2d at 839. However, the Court concluded that there were no takings before 1972 and after 1978 because, except for the period between those dates, the government had made no promise that the data would be kept secret.
Appellants do not claim that by enacting Section 72 the Legislature reneged on a prior promise, relied upon by their investors, that appellants could freely leave the private passenger automobile insurance market while continuing to write other lines of insurance. On the contrary, for years appellants' investors knew that appellants were engaged in a heavily regulated business whose private passenger automobile insurance premiums were generally considered too high. Any significant statutory reform aimed at reducing those premiums would almost certainly contain provisions to discourage insurers from leaving the private passenger automobile insurance market.
More particularly, appellants' investors had fair warning that the Legislature would link appellants' licenses to write other lines of insurance with their continuing to write private passenger automobile policies. In his 1987 veto message of Senate Committee Substitute for Senate Bill No. 2318 and Assembly Bill No. 2404, Governor Kean specifically called for legislation similar to Section 72:

*629 We need to say to insurance companies that before they quit doing business in New Jersey in one line of insurance, they must be able to show that they are doing so for a good reason. If not, the Insurance Commissioner must have the power to require the company's licenses for all lines.
* * * * * * * *
The language that I am recommending to be added includes reasonable limits on the authority of the Insurance Commissioner to require the surrender of other licenses in the holding company system of the company wishing to withdraw from our State....
The long-term regulatory environment in the pesticide industry prompted the Monsanto Court to determine that governmental disclosures of data submitted before 1972, when there were no governmental assurances of non-disclosure, did not constitute takings:
... [A]bsent an express promise, Monsanto had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA. In an industry that long has been the focus of great public concern and significant government regulation, the possibility was substantial that the Federal Government, which had thus far taken no position on disclosure of health, safety, and environmental data concerning pesticides, upon focusing on the issue, would find disclosure to be in the public interest. [467 U.S. at 1008-1009, 104 S.Ct. at 2876, 81 L.Ed.2d at 836]
We conclude that the provisions of Section 72 that authorize the Commissioner to require appellants to cease writing other lines of insurance if they choose to withdraw from the private passenger insurance market do not authorize an unconstitutional taking.

B.
Even though Section 72 does not have the effect of authorizing compensable takings, it does authorize the Commissioner to impose restrictions on appellants' business that will result in losses of their property. Appellants contend that those restrictions deprive them of property without due process.[7] We disagree.

*630 1.
Appellants first argue that the restrictions authorized by Section 72 are irrational and arbitrary. They premise the argument on a narrow view of Section 72's purpose. As they see it, the purpose of Section 72 is simply to ease the voluntary withdrawal of private passenger automobile insurers from the market. They argue from this premise that Section 72's provisions are irrational and arbitrary because they not only authorize the Commissioner to delay an insurer's withdrawal, but also authorize the Commissioner to require a withdrawing insurer to accept new business instead of shedding the business it has.
The purpose of Section 72, seen in the context of its place in the Reform Act, is obviously far broader. The Act itself identifies the Act's underlying purpose: to reduce the cost to the public of private passenger automobile insurance. "Not only has the cost of the insurance product itself escalated, but the subsidies that most drivers contribute to support the financially-troubled New Jersey Automobile Full Insurance Underwriting Association [JUA] have made the system a burden, rather than a benefit, to citizens of the State." N.J.S.A. 17:33B-2d. The overall means for correcting the problem are set forth in N.J.S.A. 17:33B-2h, which provides in relevant part:
h. To that end, the Legislature declares that it is in the public interest to:
* * * * * * * *
(2) eliminate, over time, the current residual market mechanism, the New Jersey Automobile Full Insurance Underwriting Association, and certain market subsidies currently funding its losses;
(3) provide, through the appointment of an insolvency trustee, for the orderly evaluation, prioritization and satisfaction of obligations payable on behalf of the association;
(4) provide, through assessments on property-casualty insurers ... for the funding of the debts and obligations of the association;

*631 (5) create a new residual market mechanism in which insurers will share directly in the risk of insuring the "bad driver";
(6) guarantee that "good drivers" secure motor vehicle insurance coverage in the voluntary market and control the apportionment of drivers in the residual market; ...
The Legislature has concluded that these objectives cannot be attained without the continued presence in the market of private passenger automobile insurers to carry a large part of the burden of bailing out and depopulating the JUA while continuing to provide mandatory insurance coverage to New Jersey drivers. As stated in Section 72, a private passenger automobile insurer's plan of withdrawal must provide "a minimization of the impact of the surrender or discontinuance on the public generally and on the company's policyholders in this State." Thus the due process question is whether Section 72 strikes a rational balance between a private passenger automobile insurer's desire to withdraw from the market and the public's need for it to remain in the market to share the burden of bailing out and depopulating the JUA and to continue to provide coverage to its policyholders and other applicants.
Courts presume statutes to be constitutional and sparingly exercise the power to invalidate them. Jordan v. Horsemen's Benevolent & Protective Ass'n., 90 N.J. 422, 433, 448 A.2d 462 (1982). To overcome the presumption of constitutionality, "the burden is on one complaining of a due process violation to establish if the legislature has acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752, 766 (1976). See also Hutton Park Gardens v. West Orange Town Council, 68 N.J. 543, 562-565, 350 A.2d 1 (1975).
The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned.
Nebbia v. New York, 291 U.S. 502, 527-528, 54 S.Ct. 505, 512, 78 L.Ed. 940, 951-952 (1934). Generally, it is up to the Legislature, not the courts, "to decide whether a statute bears too *632 heavily upon" a business and thereby violates due process. Ferguson v. Skrupa, 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93, 96 (1963).
So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote a public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied.
Nebbia, supra, 291 U.S. at 537, 54 S.Ct. at 516, 78 L.Ed. at 957. Accord Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).
Courts have been particularly circumspect when reviewing legislative regulation of the insurance industry because it affects the vital interests of the general public. "It is well established that the insurance business is strongly affected with a public interest and therefore properly subject to comprehensive regulation in protecting the public welfare." Sheeran v. Nationwide Mutual Ins. Co., Inc., 80 N.J. 548, 559, 404 A.2d 625 (1979). The principle that the Legislature has broad discretion in adopting police power regulations to promote what it sees as the public welfare "is peculiarly apt when the business of insurance is involved  a business to which the government has long had a `special relation.'" California State Automobile Insurance Ass'n v. Maloney, 341 U.S. 105, 109-110, 71 S.Ct. 601, 603, 95 L.Ed. 788, 792 (1951). As summarized in a leading treatise:
A state has the unquestioned power to regulate insurance companies and the method of conducting that kind of business. The business of insurance is considered not to be merely a private right, but a matter of public concern  a franchise subject to regulation by the state for the public good. And in such regulation, the legislatures are considered to have large powers and wide discretion.
19 Appleman, Insurance Law and Practice, § 10321 at 1-3 (1982).
Appellants essentially concede that it is rational for the Legislature to authorize the Commissioner to prevent the precipitous *633 withdrawal of an automobile insurer from the market. It follows that the Commissioner may condition such withdrawal upon the insurer's placing its policyholders with other insurers, unless that cannot be accomplished within a reasonable period. The dispute on this point is whether five years is a reasonable period[8] and whether it is reasonable to require that until the insurer has withdrawn, it be required to write new business and otherwise comply with the provisions of the Reform Act to which automobile insurers staying in the market are subject.
As we previously noted, Section 72 authorizes the Commissioner to require that plans of withdrawal not only protect the insurer's "policyholders in this State" but also protect "the public generally." The Commissioner concluded that the public would suffer if Twin City does not continue to bear its share of the burden of bailing out and depopulating the JUA until the withdrawal becomes effective. The Commissioner found this to be
necessary in order to provide for an orderly private passenger automobile insurance market over the next several years, during which time the transition to the market structure contemplated in the FAIR Act will occur. Requiring Twin City to accept its duties and obligations as any other private passenger automobile insurer will facilitate that transition process. Any exemption for Twin City from these obligations would simply transfer them to other insurers, increasing their burdens and making the period of transition even more difficult.
It is neither irrational nor arbitrary to require an insurer to discharge the legal obligations imposed on competing insurers until such time as it withdraws from the market.
The five-year period is not irrationally long. Although it is not certain how long it will take the private passenger automobile insurance market to stabilize after discharging the JUA debt and assimilating its population, it is certain that the *634 process could not go forward unless insurers remain in the market for years to absorb those burdens. We were told at oral argument that dozens of other insurers have applied for withdrawal. It is not for us to second-guess either the Legislature or the Commissioner as to the length of time that will be necessary to allow the process to run its course. Dougherty v. Human Services Dept., 91 N.J. 1, 6, 449 A.2d 1235 (1982).
We turn to anti-eviction legislation for an apt analogy. A landlord, the operator of a business providing a vital public service, may not withdraw his property from the rental market without giving substantial notice. For instance, in order to evict a senior citizen, the notice may be as long as 40 years. N.J.S.A. 2A:18-61.23. In upholding the constitutionality of that lengthy period, our Supreme Court identified the underlying legislative economic and social policy of protecting elderly tenants. The Court said, "Our cases have consistently affirmed the high degree of deference appropriate to evaluating the Legislature's chosen means of enhancing economic and social welfare." Edgewater Inv. Associates v. Borough of Edgewater, 103 N.J. 227, 235, 510 A.2d 1178 (1986).

2.
It is neither irrational nor arbitrary to condition appellants' licenses to write other lines of insurance, including Twin City's license to write commercial vehicle insurance, on Twin City's continuing to write private passenger automobile insurance. In reshaping its argument in terms of due process, amicus returns to Nollan v. California Coastal Commission, supra, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677, to argue that a state may not exact the surrender of a constitutional right as consideration for the favorable exercise of governmental discretion. The argument requires a closer look at the facts in Nollan.
Public beaches were on either side of the Nollans' beachfront property. They wanted to replace a small dilapidated bungalow on their property with a three-bedroom house. California required *635 them to obtain a permit from the California Coastal Commission to erect the larger building. The Commission agreed to issue the permit only if the Nollans allowed the public to use their property to get from one of the public beaches to the other.
The Court held that conditioning the issuance of the permit on the Nollans' "agreeing" to let the public use their property was a thinly disguised public taking of an easement over their land. It acknowledged that if the Commission had exacted a concession from the Nollans more closely related to its authority to regulate the bulk of the proposed building, such a concession would not be a taking. However, because the "same governmental purpose" was not served by issuing the permit and exacting the easement, the Commission's conditional issuance of the permit was "an out-and-out plan of extortion" requiring that compensation be paid for the easement. Id. at 837, 107 S.Ct. at 3149, 97 L.Ed.2d at 689, (quoting J.E.D. Associates, Inc. v. Atkinson, 121 N.H. 581, 584, 432 A.2d 12 (1981), overruled on other grounds Town of Auburn v. McEvoy, 131 N.H. 383, 553 A.2d 317 (1988)). In terms of due process, the holding is an example of the principle that a state "may not condition a privilege which it may deny altogether on a surrender of constitutional right." Kutcher v. Newark Housing Authority, 20 N.J. 181, 188-189, 119 A.2d 1 (1955). Accord Frost v. California Railroad Comm'n, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926).
Amicus likens the Commissioner's authority to regulate Twin City's withdrawal from the private passenger automobile insurance market to the California Coastal Commission's authority to regulate the size of the Nollans' house, and likens the Commissioner's assertion of authority under Section 72 to compel appellants to stop writing other lines of insurance to the Coastal Commission's assertion of authority to exact an easement from the Nollans without paying just compensation. In effect amicus argues that even if the Commissioner's action is not a taking, it is nevertheless "an out-and-out plan of extortion" *636 and therefore violates due process. However, neither amicus nor appellants have submitted authority to support their contention that an insurance carrier has a constitutional right to stop writing one of its lines because it has become less profitable, where that line is vital to the public welfare.
In sustaining the constitutionality of legislation that compels automobile insurers to renew policies, the Court in Sheeran, supra, said that the statute reflected "a clear legislative intent that companies which choose to write automobile policies in the state maintain their fair share of coverage." 80 N.J. at 557, 404 A.2d 625. Elsewhere, courts have sustained legislation compelling insurers to provide related coverage. Health Ins. Ass'n of America v. Harnett, 44 N.Y.2d 302, 376 N.E.2d 1280, 1284-1285, 405 N.Y.S.2d 634, 639 (1978) (health insurers must provide maternity coverage). Cf., New Hampshire-Vermont Health Service v. Whaland, 119 N.H. 886, 410 A.2d 642 (1979) (statute compelling Blue Cross to provide insurance for mental disorders does not violate due process or commerce clause).
Appellants rely on a case that prohibits a state from requiring general liability insurers to write insurance covering medical malpractice claims. Hartford Accident & Indemnity Co. v. Ingram, 290 N.C. 457, 226 S.E.2d 498 (1976). The court held that the public need for such insurance does not justify conscripting insurers to enter a specialized field in which they have had no experience:
While the State may, and does, require one desiring to engage in the business of writing insurance against liability for personal injury or property damage to obtain a license, the State may not, as a condition to the issuance such license, require the applicant to engage and carry on an entirely different kind of business.
226 S.E.2d at 507. The case does not help appellants because Section 72 merely seeks to encourage appellants to continue writing the line of private passenger automobile insurance that Twin City has been writing in New Jersey for years.
Appellants also rely on People ex rel. Lewis v. Safeco Ins. Co., 98 Misc.2d 856, 414 N.Y.S.2d 823 (Sup.Ct. 1987), which held *637 that insurers could not be denied permission to give up writing all their lines of insurance after sustaining continuing losses writing automobile insurance. The Court held that simply because insurance carriers had licenses to do business in a state "does not mean that they must be forever in bondage, subject to such control." Id. 414 N.Y.S.2d at 830. The case is distinguishable for two reasons. Here, appellants do not want to give up writing all lines of insurance and State Farm Mutual, supra, assures them a fair return.
We have found no case that has considered whether a state violates an insurer's constitutional right to due process by requiring it to surrender its license to write all lines of insurance if it chooses to stop writing private passenger automobile insurance. However, one court has held, albeit without elaboration, that a state may constitutionally suspend an insurer's license to sell profitable lines of insurance until it has complied with mandatory renewal requirements applicable to its line of automobile insurance. Maryland Casualty Co. v. Commissioner of Ins., 372 Mass. 554, 363 N.E.2d 1087 (1977).
Although the precise issue before us is novel, it has been recognized that a state may constitutionally require the provider of a vital public service to provide that service to a part of its market, which, standing alone, is not profitable. See e.g. Continental Air Lines, Inc. v. Dole, 784 F.2d 1245, 1251 (5th Cir.1986) (airline may be compelled to operate one small route at a loss for a limited period of time).
Dictum in Penna. Reading S.S. Lines v. Bd. of Pub. Utility Com'rs, 5 N.J. 114, 126, 74 A.2d 265 (1950), is also apt. The Court there held that the then Board of Public Utility Commissioners could not compel a railroad in financial straits to continue service on an unprofitable branch line that was little used and was paralleled by a well-used bus route:
If the situation were such that the branch line was serving a real public need of passengers or the railroad as a whole was making a profit although this particular branch was operating at a loss, the problem would be an entirely different one; in either of these events, to order the railroad to continue service *638 might not be arbitrary and unreasonable in view of all the circumstances. But here the branch line serves no public need for passenger service and not only the branch line but the entire railroad has been operating at a loss for a considerable number of years.
Here, writing private passenger automobile insurance is serving a real public need and neither appellants nor Twin City claims to be operating at a loss. We are satisfied that Section 72 does not overstep the constitutional bounds of due process by requiring appellants to continue to write less profitable private passenger automobile insurance as a condition to writing other more profitable lines of insurance.

3.
Appellants next argue that the retroactive feature of Section 72 denies them due process. It will be recalled that Twin City had submitted its application of withdrawal a week before the Reform Act became effective on March 12, 1990. Section 72 provides that it applies to any request for withdrawal "filed on or after January 25, 1990," the date that Governor Florio proposed the Reform Act to a joint session of the Legislature.
A statute may constitutionally be made retroactive, and "[p]rovided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." Pension Benefit Guaranty Corp. v. Gray & Co., 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601, 611 (1984). See also Edgewater Inv. Associates v. Borough of Edgewater, supra, 103 N.J. at 238, 510 A.2d 1178. The retroactive feature of Section 72 serves the legitimate legislative purpose of preventing private passenger automobile insurers from racing to withdraw from the market before the effective date of the Reform Act.

*639 C.
We reject appellants' argument that Section 72 denies them the equal protection of the laws. U.S. Const. amend. XIV, § 1. They contend that Section 72 requires them to give up profitable lines of casualty insurance because they are unwilling to continue to write private passenger automobile insurance whereas no such penalty is imposed on casualty insurers not affiliated with private passenger automobile insurers. The distinction is obviously related to furthering a legitimate state interest. New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511, 516-517 (1976). The Legislature has reasonably chosen to support the private passenger automobile insurance market by inducing insurers already in that market to continue to write that line of insurance.
We need not consider whether the Legislature should have or legally could have supported the private passenger automobile insurance market by requiring casualty companies to write such insurance who were not already in that market. "When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations." Ibid. (upholding ordinance prohibiting vendors selling foodstuffs from pushcarts in the French Quarter, but exempting those vendors who have been selling in the French Quarter for eight years or more). See also Ferguson v. Skrupa, supra, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (upholding statute prohibiting anyone other than lawyers from engaging in the business of debt adjusting).

D.
We also reject the various arguments advanced by amicus that Section 72 violates the commerce clause. By enactment of the McCarran-Ferguson Act, 15 U.S.C.S. § 1011 et seq., Congress has expressly left to the states the regulation of the insurance business. Its purpose is to "give support to the *640 existing and future state systems for regulating and taxing the business of insurance." Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 429, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342, 1360 (1946).

II.
In their final arguments, appellants challenge the action of the Commissioner on the grounds that he acted beyond the authority of Section 72, acted arbitrarily, capriciously, and unreasonably, and improperly acted through an adjudicatory process instead of through the adoption and application of regulations.

A.
The major complaint is that the Commissioner acted with an unreasonably heavy hand, and beyond his statutory authority, by compelling Twin City to continue to write private passenger automobile insurance for what may be more than five more years and also requiring appellants to give up writing other lines of insurance as the price for letting Twin City withdraw from the private passenger automobile insurance market.
In our prior discussion we sustained Section 72, including the authority it expressly and impliedly gives the Commissioner, as a reasonable implementation of a proper governmental purpose. For the same reasons we conclude that the Commissioner's actions were reasonable and therefore beyond our authority to overrule or modify. N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-563, 384 A.2d 795 (1978).

B.
The State concedes that in one respect the Commissioner overstepped the bounds of Section 72. That section limits the Commissioner's discretion to order surrender of certificates of authority to write other lines of insurance to those "certificates of authority issued pursuant to chapter 17 or 32 of Title 17." *641 The Commissioner's order for orderly withdrawal requires surrender of certificates of authority not only by ITT Hartford Group's "property and casualty" affiliates but also by its "life and health affiliates." The Commissioner exceeded his statutory authority because ITT Hartford Group's foreign life and health insurer affiliates are not licensed under Title 17 but under Title 17B, specifically N.J.S.A. 17B:23-1. Accordingly, the Commissioner has agreed to modify his order to eliminate from its coverage Hartford Life Insurance Company and Hartford Life and Accident Insurance Company.

C.
Whatever concerns we may have had as to whether the Commissioner should have proceeded under duly adopted regulations rather than through an individual adjudicatory process have been rendered moot by the Commissioner's adoption of comprehensive regulations on April 23, 1991, N.J.A.C. 11:2-29. We do not pass on the substance of the regulations, but we remand to give Twin City an opportunity to have its withdrawal application reconsidered by the Commissioner in light of the provisions of these new regulations. See Home News Publishing Co. v. State, 224 N.J. Super. 7, 13, 539 A.2d 736 (App.Div. 1988); Department of Corrections v. McNeil, 209 N.J. Super. 120, 125, 506 A.2d 1291 (App.Div. 1986), certif. denied 104 N.J. 422, 517 A.2d 418 (1986); K.P. v. Albanese, 204 N.J. Super. 166, 180, 497 A.2d 1276 (App.Div. 1985), certif. denied 102 N.J. 355, 508 A.2d 225 (1985). Accord 613 Corp. v. State of N.J., Div. of State Lottery, 210 N.J. Super. 485, 510 A.2d 103 (App.Div. 1986).

D.
We are satisfied from a careful review of this record that the other issues raised are clearly without merit and require no further discussion. R. 2:11-3(e)(1)(E).
Section 72 of the Fair Automobile Insurance Reform Act of 1990, L. 1990, c. 8, N.J.S.A. 17:33B-30, is sustained as constitutional. *642 The matter is remanded to permit the Commissioner to reconsider Twin City's application for withdrawal in light of the provisions of N.J.A.C. 11:2-29.
NOTES
[1] The condition provides:

Twin City shall be required to seek for a period of no more than five years after the date of this Division and Order, a replacement carrier or carriers acceptable to the Commissioner for its New Jersey private passenger automobile insurance business. If Twin City is successful in placing all of its insureds with such other carriers prior to expiration of this five-year period, and if Twin City's New Jersey liabilities and potential liabilities [footnote omitted] have been fully satisfied prior to expiration of this five-year period, then Twin City's Certificate of Authority shall be surrendered and its authority to write business in New Jersey shall be terminated as of the date that these requirements have been fulfilled. If at the end of the five-year period, Twin City has not succeeded in finding replacement coverage for all of its insured, Twin City may nonrenew its remaining policies in-force as the policies expire.
[2] The condition provides in relevant part:

[Twin City] shall comply with all other appropriate laws as amended by the FAIR Act which are not inconsistent with this Decision and Order, specifically including but not limited to the following:
a. N.J.S.A. 17:33B-15 regarding mandatory availability and issuance of automobile insurance coverage;
b. N.J.S.A. 17:33B-25 prohibiting an insurer from refusing to issue or renew automobile insurance;
c. N.J.S.A. 17:33B-9 regarding mandatory assignment of producers; and
d. N.J.S.A. 17:30E-14 and N.J.S.A. 17:33B-11 regarding residual market depopulation quotas and sharing of profits and losses related to residual market business.
[3] The condition provides:

With respect to all of its other lines of business, Twin City shall be required to seek, for a period of no more than five years after the date of this Decision and Order, a replacement carrier or carriers acceptable to the Commissioner. Upon either placing all of its other business with an acceptable replacement carrier or the expiration of five years, whichever is sooner, Twin City shall nonrenew its remaining other insurance business in-force as the policies expire.
[4] The condition provides in relevant part:

All of Twin City's property and casualty and life and health affiliates within ITT Hartford Group, Inc. shall surrender their respective Certificates of Authority for amendment immediately upon approval of Twin City's plan, so the Department can limit and restrict the use of each affiliates's certificate to the ... lines of insurance it currently writes in New Jersey. Twin City's property and casualty and life and health affiliates shall submit to the Commissioner for approval their respective Plans of Orderly Withdrawal within 60 days after receipt of the Decision and Order. In particular, the Plan of Withdrawal for Hartford Underwriters Insurance Company shall include its homeowners and automobile insurance program for members of the American Association of Retired Persons (AARP). Those Plans of Withdrawal shall provide for the termination of the transaction of insurance business in New Jersey no later than five years from the date of approval of the plans of withdrawal by the Commissioner, as the affiliates' policies expire, after which time the Certificates of Twin City's affiliate companies will be indefinitely suspended....
[5] In our later consideration of the "due process" issue, we will discuss whether Section 72 does "promote the public good."
[6] The facts of Nollan will be discussed below in more detail.
[7] The United States Constitution provides in pertinent part, "nor shall any State deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. Our Supreme Court follows the same standards developed by the United States Supreme Court under the federal Constitution for resolving due process claims under the New Jersey Constitution. State Farm Mutual, supra, 124 N.J. 32, 590 A.2d 191.
[8] The maximum period actually exceeds five years because at the expiration of that period the carrier is only authorized to send its policyholders notices of nonrenewal. The withdrawal is not effective until its policies have expired.